**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**T.J. and C.J., on behalf of their minor child B.J.**
   **Plaintiffs,**

**v.**                                                   **Case No.  12-CV-00565 RB/LFG**

**Danny Pacheco, et al.**
   **Defendants.**

**DEFENDANTS' MOTION FOR SUMMARY JUDGEMNT ON COUNT I OF
PLAINTIFFS' COMPLAINT BASED ON QUALIFIED IMMUNITY
AND MEMORANDUM OF LAW IN SUPPORT**

COME NOW the Defendants, by and through their attorneys, Basham & Basham, P.C.

(Katherine A. Basham, Esq.), and hereby move this Court for summary judgment in their favor

on Count I of the complaint based on the doctrine of qualified immunity.  The Plaintiffs' lawsuit

centers on a forty-six (46) hour period from 2:00 PM on September 7, 2010 to 11:39 AM on

September 9, 2010.  During that time frame, Plaintiff B.J., who was two-months shy of his

sixteenth birthday, was attending Espanola Valley High School.  On September 7, 2010, B.J.

brought to school three lists of fellow students he admits to writing, the most disturbing of which

he titled "list for hell."  B.J. also had in his possession several drawings he admits he drew

depicting disturbing scenes such as a "shack of blood," a beheading by a man wearing a t-shirt

emblazoned with the words "unleash hell," a bloody scene in a room that appeared to be a

chemistry lab, a torture room with two heads on a "head shelf," and a graveyard with four

headstones containing names of fellow students with the words "to HELL" at the bottom.

Espanola Police Lieutenant Christian Lopez responded to the high school, and met with

B.J., his mother C.J., and several school staff.  B.J. told Lt. Lopez that he was not sure if he was

capable of hurting himself or others.  B.J.'s mother told Lt. Lopez that B.J. had been violent with

her and that she was afraid of B.J.  The staff at the school told Lt. Lopez that students were

fearful of B.J.   It was decided by the police and school personnel, including a school psychologist, that B.J. should be immediately transferred by ambulance from the school to St. Vincent's hospital for a psychiatric hold.

The next day, information was circulating that B.J. was no longer in the custody of St. Vincent's hospital.   The staff at Espanola Valley High School informed the Espanola Police Department they feared that B.J. was no longer at the hospital, and they feared he would return to the high school to carry out the threats depicted in his writings and drawings.   At this point, Lt. Lopez filled out a criminal complaint and probable cause statement and called Juvenile Probation Officer Martha Fernandez for permission to arrest B.J.   The JPO gave her approval to the arrest of B.J., and Lt. Lopez dispatched Espanola Police Sergeant Richard Gallegos to take B.J. into custody.   However, when Sgt. Gallegos went to B.J.'s home, B.J. and his mother, suspecting it was the police at their door, "hid" in the house and did not answer the door.   The next morning, a fire alarm was set off at the school and an anonymous phone call to the school claimed a student with a gun was at the school.   Lt. Lopez went to the high school and again was informed by the staff that the staff and students were fearful that B.J. would come to the school and carry out the threats depicted in his writings and drawings.   Efforts to locate B.J. were stepped up and he was finally located in the waiting room at a medical office in Espanola where he was arrested without incident.

In Count I of their complaint, the Plaintiffs claim that the Espanola Police Department violated B.J.'s Fourth Amendment Rights by unlawfully arresting him and using excessive force when he was arrested. The Defendants claim that are entitled to qualified immunity on the unlawful arrest claim because they had "arguable probable cause" to arrest B.J., and in the alternative, B.J.'s arrest was necessary to protect the public. As to the excessive force claim, the

Plaintiffs have admitted that B.J. suffered no physical injuries and that the claim for excessive force is based entirely on the argument that no force at all is justified. However, an excessive force claim must be based on more than mere handcuffing of an arrestee.

## I.  STATEMENT OF UNDISPUTED MATERIAL FACTS

1.  On Tuesday, September 7, 2010, at approximately 2:00 PM, Espanola Police Lieutenant Christian Lopez responded to a call at Espanola Valley High School and met with school resource officer Danny Pacheco, Assistant Principal DeVanna Ortega, school psychologist Lloyd Vigil, school security officer Chris Archuleta, and a student identified as B.J. in this lawsuit. *See* Affidavit of Lt. Christian Lopez, attached hereto as Exhibit A; Affidavit of Danny Pacheco, attached hereto as Exhibit B; Affidavit of DeVanna Ortega, attached hereto as Exhibit C; and Affidavit of Lloyd Vigil, attached hereto as Exhibit D.

2.  During the meeting, B.J.'s mother identified as C.J. in this lawsuit arrived at the school. *See* Exhibits A & C.

3.  Lt. Lopez was shown writings and drawings that were found in B.J.'s backpack. *See* Exhibits A, B, C, D.

4.  B.J. admitted to Lt. Lopez that he wrote and drew the documents. *See* Exhibits A, B, & C.

5.  Lt. Lopez observed three lists of names, one of which was titled "list for hell." B.J. stated that the names on the lists were names of other students in the school who "bugged him." The lists are attached hereto as Exhibit 1 to Lt. Lopez's affidavit. *See* Exhibit A, B, & C.

6.  The drawings that concerned Lt. Lopez depicted the following: a disturbing scene of a "shack of blood," a beheading by a man wearing a t-shirt emblazoned with the words "unleash hell," a bloody scene in a room that appeared to be a chemistry lab, a torture room with two people in restraints (one with the name Angel on her t-shirt) and two heads on a "head shelf,"

3

and a graveyard with four headstones containing names of fellow students with the words "to HELL" at the bottom. These drawings are attached hereto as Exhibit 2 to Lt. Lopez's affidavit. *See* Exhibit A.

7. B.J. stated the pictures were of scenes from a movie he wanted to make. *See* Exhibit A

8. B.J. stated he used names of other students on the tombstones because they were students he would see on a daily basis who would "bug" him. *See* Exhibits A, B, & C.

9. Lt. Lopez confirmed with Assistant Principal Ortega that some of the names on the lists, including the "list for hell," and on the tombstones were students at Espanola Valley High School. *See* Exhibits A & C.

10. The fellow students identified on the lists are Jolene Benson (whom B.J. referred to as Pink Whore on the tombstone picture and the List for Hell); Chris D., and Austin. *See* Exhibits A, B, & C.

11. The fellow students identified on the tombstones were Jolene Benson, Austin C. and Chris D. Trujillo. *See* Exhibit A, B & C.

12. Lt. Lopez asked B.J. if he was going to hurt or injure himself and he replied "I don't think so" but that sometimes he didn't know what he was thinking in his head. *See* Exhibit A, B, C & D

13. At this point, B.J.'s mother C.J. intervened in the interview and stated that B.J. did have violent tendencies as he did express them two weeks prior, when she told him to take a bath and get ready for school the next day. C.J. stated B.J. had placed his hand around C.J.'s throat and then grabbed her arms. C.J. still had bruises on the upper part of her arm that were in the healing process, which Lt. Lopez observed. C.J. stated they were caused by B.J. *See* Exhibits A, C & D.

14. Lt. Lopez then asked B.J. if he thought he could hurt someone, or any of the fellow students on the list and B.J. stated that he did not know. *See* Exhibits A & C.

15. Lt. Lopez again asked B.J. if he would hurt himself such as kill himself, and B.J. stated "I don't know sometimes I think that's the only way out." *See* Exhibits A & C.

16. C.J., B.J.'s mother, expressed concern for her safety not knowing if B.J. would attack her. *See* Exhibits A & C.

17. Lt. Lopez was informed by C.J. that she had contacted B.J.'s father T.J., who lived in Georgia, about the unfolding situation, and T.J. was very aggressive and started yelling over the telephone. *See* Exhibit A.

18. The school also had in its possession, and showed Lt. Lopez, a handwritten note from a student and an email from a teacher regarding B.J. *See* Exhibits A & C.

19. The handwritten note was authored by a student named Samantha Madrid and stated that B.J. was threatening her and telling her he was going to kill her. According to the note, B.J. told Samantha Madrid that she was on B.J.'s "hit list" and that he was going to bring a knife or gun to school and kill her. The student feared coming to school because of B.J. A copy of this handwritten note is attached to Lt. Lopez's affidavit as Exhibit 3. *See* Exhibits A, C.

20. The email was sent to Gloria Champion from teacher Josefina Litera at 11:44 AM on September 7, 2010. In it, Ms. Litera stated that a female student observed B.J. making a list and that her name was on the list. In the email, Ms. Litera stated that the female student told Ms. Litera that she was afraid of B.J. Ms. Litera also noticed that B.J.'s hands were shaking. A copy of this email is attached to Lt. Lopez's affidavit as Exhibit 4. *See* Exhibits A & C.

21. Lt. Lopez was also informed by school psychologist Lloyd Vigil that at one point when Dr. Vigil walked back into the room where B.J. and C.J. were, Dr. Vigil observed C.J. with her

head in her son's lap, she was very distraught and B.J. was trying to comfort his mother.  C.J. also appeared very distressed at the thought that B.J. may be taken from her for psychiatric care and stated something to the effect that she "needs" B.J. with her.  Dr. Vigil was concerned enough about this regressive behavior of a mother towards a son that Dr. Vigil told Lt. Lopez of the mother's behavior and the fact that her behavior concerned Dr. Vigil. *See* Exhibit D.

22. B.J. was transported from the high school to St. Vincent's Hospital by ambulance for a psychiatric evaluation. *See* Exhibits A & C.

23. The next day, on September 8, 2010, Lt. Lopez was informed by Espanola High School Assistant Principal Reuben Salazar that Salazar's daughter received phone calls from B.J. the night before asking that she come and pick him up from the hospital. *See* Exhibits A & C

24. Lt. Lopez also spoke to Mr. Salazar's daughter who confirmed that B.J. had called her from the hospital the night before asking for a ride home.  She described B.J. as sounding "distant" on the telephone. *See* Exhibit A

25. Assistant Principal Ortega also heard from fellow Assistant Principal Salazar that his daughter had received phone calls from B.J. the night before asking the daughter to come and pick him up from the hospital. *See* Exhibit C

26. Assistant Principal Salazar told Assistant Principal Ortega that he was concerned for the safety of his daughter, a student at the high school.  Assistant Principal Ortega told school resource officer Danny Pacheco of the fear that the staff and students had that B.J. was no longer at the hospital and would return to school to act out what he had written and drawn. *See* Exhibit C

27. Lt. Lopez was contacted by the Assistant Superintendent Dr. Trujillo who told Lt. Lopez that Assistant Principal Salazar had contacted him to express his fear, as well as the fear of

others at the high school, that B.J. would come to the school and act out what he had written and drawn. *See* Exhibit A

28. Based on the foregoing, Lt. Lopez believed he had probable cause to arrest B.J.  He also believed B.J.'s arrest was necessary to protect the public. *See* Exhibit A.

29. On September 8, 2010, Lt. Lopez prepared the Criminal Complaint and Statement of Probable Cause attached to his affidavit as Exhibit 5. *See* Exhibit A.

30. That same day, Lt. Lopez spoke to Juvenile Probation Officer (JPO) Martha Fernandez at the Espanola Probation Office and requested permission to arrest B.J.  JPO Fernandez approved the Juvenile Statement of Probable Cause and Complaint. *See* Exhibit A.

31. JPO Fernandez works for the State of New Mexico Children Youth and Families Department (CYFD) and is assigned to Rio Arriba County. *See* Affidavit of Martha Fernandez, attached hereto as Exhibit E.

32. When JPO Fernandez receives a phone call from a law enforcement officer, she gathers information from that law enforcement officer regarding the situation.  *See* Exhibit E.

33. JPO Fernandez uses the information gathered from Law Enforcement and immediately consults with CYFD Statewide Central Intake, to determine how to proceed with respect to the best interests of the juvenile and the public. *See* Exhibit E.

34. JPO Fernandez follows the criteria for detention of juveniles which appears in NMSA 1978, section 32A-2-11. *See* Exhibit E.

35. JPO Fernandez follows the Detention Risk Assessment Instrument developed by CYFD, which refers to the list in 31-22-8 (Crimes Enumerated) as the crimes which require automatic Detention. *See* Exhibit E.

36. JPO Fernandez notifies the District Attorney of any felony complaints by way of Preliminary Inquiry, at which time the District Attorney decides how to proceed. *See* Exhibit E.

37. After receiving approval from JPO Fernandez to arrest B.J., Lt. Lopez asked Espanola Police Office Richard Gallegos to make contact with the Ohkay Owingeh Police Department and ask permission to go to B.J.'s residence in Ohkay Owingeh Pueblo to arrest B.J. *See* Exhibit A and Affidavit of Richard Gallegos attached hereto as Exhibit F.

38. Sergeant Richard Gallegos made contact with the Ohkay Owingeh Police Department and asked permission to go to B.J.'s residence in Ohkay Owingeh Pueblo to arrest B.J. *See* Exhibit F.

39. The Ohkay Owingeh Tribal Court Judge gave Sgt. Gallegos permission to arrest B.J. A copy of the authorization is attached to Sgt. Gallegos' affidavit as Exhibit 1. *See* Exhibit F.

40. Sgt. Gallegos was accompanied by a tribal police escort and went to B.J.'s home. No one answered the door. *See* Exhibit F.

41. B.J. and his mother heard the knocking but hid in the house because they thought it was the police. *See* Transcript of B.J. interview, attached hereto as Exhibit G.

42. On September 9, 2010, B.J. had still not been located when Lt. Lopez arrived at Espanola Valley High School. A fire alarm went off and the fire department was called. *See* Exhibits A & C.

43. When Lt. Lopez arrived at the high school, Lt. Lopez was informed that an anonymous caller had called the High School switchboard and stated that there was a student on campus with a black handgun in his backpack. *See* Exhibits A & C.

44. Lt. Lopez began searching the high school when Lt. Lopez was notified by Sgt. Gallegos that he had information as to B.J.'s whereabouts.  Lt. Lopez instructed Sgt. Gallegos to arrest B.J. *See* Exhibits A & F.

45. Sgt. Gallegos went to Presbyterian Center and was informed by the receptionist that B.J. was not there.  Sgt. Gallegos asked the receptionist to call dispatch if B.J. did arrive. *See* Exhibit F.

46. A short time later, Sgt. Gallegos received a call from dispatch that the Center had called to inform them that B.J. was at the Center. *See* Exhibit F.

47. When Sgt. Gallegos arrived at the Center, B.J. was in a side room that looked like a waiting room. *See* Exhibit F.

48. Sgt. Gallegos explained to B.J. what he was doing and placed him in handcuffs only (not leg shackles). *See* Exhibit F.

49. At no time did B.J. complain that the handcuffs were hurting him. *See* Exhibit F.

50. Sgt. Gallegos drove B.J. to the Española Detention Center. *See* Exhibit F.

51. Sgt. Gallegos filled out a booking authority form on September 9, 2010, a copy of which is attached to Sgt. Gallegos' affidavit as Exhibit 2. *See* Exhibit F.

52. Sgt. Gallegos relied upon Christian Lopez's statement of probable cause and the criminal complaint in arresting B.J., a copy of which is attached to Sgt. Gallegos' Affidavit as Exhibit 3. *See* Exhibit F.

## II. ARGUMENT

Summary judgment must be granted if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *Koch v. City of Del City,* 660 F.3d 1228, 1238 (10th Cir. 2011). "Judgment as a matter of law is appropriate when the nonmoving party has failed to make a sufficient showing on an essential element of his or her case with

respect to which he or she has the burden of proof." *Id.* While the burden of persuasion is normally on the movant to show that he or she is entitled to judgment as a matter of law, the burden is shifted when the motion for summary judgment is based on qualified immunity. *Id.* When a defendant asserts qualified immunity at the summary judgment stage, it is the <u>plaintiff</u> that must show that (1) the defendant violated a constitutional right, and (2) the right was clearly established at the time of the alleged unlawful activity. *Id.; see also Lundstrom v. Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010) *citing Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Koch,* 660 F.3d at 1228 (internal quotations and citations omitted).

## A. <u>Plaintiffs cannot show that the Defendants violated B.J.'s constitutional rights, or in the alternative, cannot show that the right was clearly established.</u>

Under the doctrine of qualified immunity, "[i]f a police officer reasonably believes that his actions were lawful in light of clearly established law and based upon all information available to him at the time, then he shall be immune from liability. *Davis v. Scherer*, 468 U.S. 183, 191 (1984). In the qualified immunity/summary judgment context for an alleged unlawful arrest, "not only must the plaintiff demonstrate that the officer arrested [the plaintiff] without probable cause (that is, that he violated a constitutional right), but also that it would have been clear to a reasonable officer that probable cause was lacking under the circumstances (that is, that the right was clearly established in the specific situation)." *Koch*, 660 F.3d at 1241, *citing Bowling v. Rector*, 584 F.3d 956, 964 (10th Cir. 2009) ("Our inquiry into whether a constitutional right was clearly established must be undertaken in light of the specific context of the case, not as a broad general proposition" (internal quotation marks omitted)). Accordingly,

an arresting officer is entitled to qualified immunity for a warrantless arrest "if a reasonable officer could have believed that probable cause existed to make the arrest." *Koch*, 660 F.3d at 1241 *citing Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1191 (10th Cir. 2007). "Under this framework, sometimes referred to as 'arguable probable cause,' "[e]ven law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity.'" *Koch*, 660 F.3d at 1241 *quoting Cortez v. McCauley*, 478 F.3d 1108, 1120 & n.15 (10th Cir. 2007) (en banc).

### 1. *Defendants had arguable probable cause to arrest B.J.*

"Arguable probable cause exists when an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed." *Durruthy v. Pastor*, 351 F.3d 1080, 1089 (11th Cir. 2003) (internal quotations and citations omitted). Arguable probable cause does not require that the officer prove every element of a crime. *Id.* "The reasonableness of a police officer's actions is evaluated from the perspective of a reasonable officer on the scene, recognizing the police officer may have been forced to make split-second decisions in a stressful, dynamic, and dangerous environment." *Lundstrom*, 616 F.3d at 1120. The focus of the inquiry is the officer's knowledge, and, "although probable cause requires more than suspicion, it does <u>not</u> require convincing proof." *Durruthy*, 351 F.3d at 1088 (11th Cir. 2003) (emphasis added) (internal quotations and citations omitted). Indeed, "[i]t does not even require the suspect's guilt to be 'more likely true than false.'" *Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011)

The undisputed material facts of this case show that there was "arguable probable cause" to arrest B.J. for several misdemeanors[1] and felonies. It is irrelevant to the question of the

---

[1] Under New Mexico law, a warrantless arrest can be made for a misdemeanor if the arresting officer has reasonable grounds, based on personal investigation which may include information

constitutionality of B.J.'s arrest that Lt. Lopez did not list in his probable cause statement all the crimes for which B.J. could be arrested. "The constitutionality of an arrest does not depend on the arresting officer's state of mind...All that matters is whether he possessed knowledge of evidence that would provide probable cause to arrest [the arrestee] on <u>some</u> ground. *Apodaca v. City of Albuquerque,* 443 F.3d 1286, 1289 (10ᵗʰ Cir. 2006) (emphasis by the court). "An arrest is not invalid under the Fourth Amendment simply because the police officer subjectively intended to base the arrest on an offense for which probable cause is lacking, so long as the circumstances, viewed objectively, justify the arrest." *Id.* (internal quotations and citations omitted).

(a) <u>There was arguable probable cause to arrest B.J. for Assault</u>

Under NMSA 1978, §30-3-1, assault consists of any unlawful act, threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery. B.J. had drawn depictions of murders together with a "list for hell" and pictures of tombstones with fellow students' names on both the list and the tombstones. (Undisputed Material Facts (UMFs) 3-11) The staff at Espanola Valley High School informed Lt. Lopez that they were fearful that B.J. would come back to the school and act out what he had written and drawn, a fear that was intensified when the school and the police officers learned that B.J. was no longer in the custody of the St. Vincent's hospital. (UMFs 26, 27) Under New Mexico law, Lt. Lopez had arguable probable cause to arrest B.J. for the misdemeanor offense of assault because Lt. Lopez personally observed the threats made in the notebook, and Lt. Lopez was informed by school personnel that staff and students were fearful of B.J.

---

from eyewitnesses, to believe the person arrested has committed a crime. *See State v. Ochoa,* 2008-NMSC-23, ¶12, 143 N.M. 749, 182 P.3d 130. In addition, under the police-team exception, an officer other than the one that personally investigated the misdemeanor may make the actual arrest. *Id.* The knowledge of one officer supporting an arrest may be imputed to other law enforcement officers acting in conjunction with the knowledgeable officer. *See United States v. Hensley,* 469 U.S. 221, 232-33 (1985).

(b) There was arguable probable cause to arrest B.J. for Harassment

Harassment consists of knowingly pursuing a pattern of conduct that is intended to annoy, seriously alarm or terrorize another person and that serves no lawful purpose. NMSA 1978, § 30-3A-2. The staff at Espanola Valley High School informed Lt. Lopez that B.J.'s lists and drawings created serious alarm among the students and the staff, a fear that was intensified when the school learned that B.J. was no longer in the custody of St. Vincent's hospital. (UMFs 26-27) Thus, under New Mexico law, Lt. Lopez had arguable probable cause to arrest B.J. for the misdemeanor offense of harassment because Lt. Lopez personally observed the threats made in the notebook, and Lt. Lopez was told by school personnel that staff and students were fearful of B.J. (UMFs 18-20; 27)

(c) There was arguable probable cause to arrest B.J. for Stalking

Stalking consists of knowingly pursuing a pattern of conduct, without lawful authority, directed at a specific individual when the person intends that the pattern of conduct would place the individual in reasonable apprehension of death, bodily harm, sexual assault, confinement or restraint of the individual or another individual. "Pattern of conduct" means two or more acts, on more than one occasion, in which the alleged stalker by any action, method, device or means, directly, indirectly or through third parties, follows, monitors, surveils, threatens or communicates to or about a person. NMSA 1978, § 30-3A-3. In the case at hand, B.J. threatened two students at least twice. Fellow classmate Jolene Bensen was both on B.J.'s "list for hell" as well as the drawing with her name on a tombstone. (UMFs 10, 11) This is also true of Chris D. Trujillo. (UMFs 10, 11) Because Lt. Lopez personally observed the threats, and B.J. admitted that he was the author of those threats, Lt. Lopez had arguable probable cause to arrest B.J. for Stalking.

(d) There was arguable probable cause to arrest B.J. for Public Nuisance

Under NMSA 1978, §30-8-1, a public nuisance consists of knowingly creating, performing or maintaining anything affecting any number of citizens without lawful authority which is either injurious to public health, safety, morals or welfare; or interferes with the exercise and enjoyment of public rights, including the right to use public property.   The perceived threats of B.J., as observed first hand by Lt. Lopez, certainly created fear among a number of citizens, were injurious to public welfare, and interfered with the students and staff's enjoyment of their right to use school property. (UMFs 26-27)  Thus, Lt. Lopez had arguable probable cause to arrest B.J. for Public Nuisance.

(e) There was arguable probable cause to arrest B.J. for Interference with the Educational Process

In New Mexico, it is unlawful to willfully interfere with the educational process of any public or private school by committing, threatening to commit or inciting others to commit any act which would disrupt, impair, interfere with or obstruct the lawful mission, processes, procedures or functions of a public or private school. NMSA 1978, § 30-20-13.  Recently, four students at Belen high school were arrested for violating this statute when they made comments about "shooting up" their school. *See* Exhibit H.  In the Belen case there were no drawings or plans found. *See* Exhibit H.  In the case at hand, Lt. Lopez personally witnessed the drawings and the lists of classmates including the "list for hell."  Thus, Lt. Lopez had arguable probable cause to arrest B.J. for Interference with the Educational Process.

(f) There was arguable probable cause to arrest B.J. for Aggravated Assault

Under NMSA 1978, § 30-3-2, it is a felony to willfully and intentionally assault another with intent to commit any felony.  The facts as set forth above would lead a reasonable police officer to believe that B.J. threatened violence against several classmates and that he intended to

carry out those threats.   Thus, Lt. Lopez had arguable probable cause to arrest B.J. for Aggravated Assault.

(g) <u>There was arguable probable cause to arrest B.J. for Attempt to Commit a Felony</u>

Under NMSA 1978, §30-28-1 it is a misdemeanor to attempt to commit aggravated assault and a felony to attempt to commit murder.   It is reasonable for a police officer to treat B.J.'s actions as an attempt to assault fellow students with intent to commit murder.   Thus, Lt. Lopez had arguable probable cause to arrest B.J. for Attempt to Commit a Felony.

### 2. *Similar fact patterns in other cases support a finding that Defendants had arguagble probable cause to arrest B.J.*

(a) <u>Ryburn v. Huff</u>

The case at hand is strikingly similar to that of the recent United States Supreme Court case *Ryburn v. Huff*, 132 S.Ct. 987, 181 L.Ed.2d 966 (2012) (*per curiam*).   Police officers in *Ryburn* responded to a high school because a student was rumored to have written a letter to shoot up the school.  *Id.* at 988.   The principal expressed concern for the safety of her students. *Id.* The officers learned that the student had been absent from class, was subjected to bullying, and at least one of the student's classmates believed that the student was capable of carrying out the alleged threat.  *Id.*   The officers were concerned and went to the student's house to interview him.  *Id.*   When the officers arrived and knocked on the door, no one answered even though the student and his mother were inside the house and knew that the police wanted to talk to the student.  *Id.* The student and his mother eventually did come out of the house but refused to allow the officers inside the house to interview her son.  *Id.*   The officers found it "extremely unusual" for a parent to decline an officer's request to interview a juvenile inside.  *Id.*   After the officers asked the mother if there were any guns in the house, she turned around and ran into the house. *Id.* at 989.

The *Ryburn* Court found that the officers were entitled to qualified immunity because the mother's odd behavior, combined with the information the officers gathered at the school, could have led reasonable officers to believe there were weapons inside the house and family members or the officers themselves were in danger. *Id.* "Within a very short period of time, the officers were confronted with facts and circumstances giving rise to grave concern about the nature of the danger they were confronting." *Id.*  The U.S. Supreme Court criticized that Court of Appeals for the Ninth Circuit in denying qualified immunity pointing out the appellate panel majority was "far removed from the scene and with the opportunity to dissect the elements of the situation." *Id.* at 991.   The U.S. Supreme Court also rejected the Court of Appeal's dismissal of the significance of the mother's failure to respond to the door when the officers knocked and announced their presence.  *Id.*  The Court of Appeals had found that "it was irrelevant that the Huffs did not respond...because the Huffs had no legal obligation to respond to a knock on the door." *Id.* The U.S. Supreme Court rejected the premise that conduct cannot be regarded as a matter of concern so long as it is lawful." *Id.*  Instead, the Supreme Court declared "[i]t should go without saying...that there are many circumstances in which lawful conduct may portend imminent violence." *Id.*   The Court of Appeals was further criticized for looking at "each separate event in isolation" and concluding that "each, in itself, did not give cause for concern." *Id.* Rather, as the Supreme Court found, "it is a matter of common sense that a combination of events each of which is mundane when viewed in isolation may paint an alarming picture." *Id.* The U.S. Supreme Court repeated the District Court's "wise admonition that judges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation," and the Court cautioned against second-guessing, "[w]ith the

benefit of hindsight and calm deliberation" the reasonableness of the officers' "fear that violence was imminent." *Id.* at 991-992

> [W]e have instructed that reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight" and that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving."

*Id.* at 992 *quoting Graham v. Connor*, 490 U.S. 386, 396-397 (1989).

(b) Strawn v. Holohan

The federal district court for the Northern District of New York also faced a similar fact situation in *Strawn v. Holohan*, 2008 U.S. Dist. LEXIS 618 (2008) a copy of which is attached hereto as Exhibit I. In *Strawn*, the New York State Police were dispatched to Averill Park High School to investigate a report by a school administrator that a student had written an entry in a notebook entitled "School Shootings." *See* page 1 of Exhibit I. The "School Shootings" entry in the student's notebook described "the perfect plan" in which Averill Park students "are tricked into evacuating the school due to a bomb threat only to be killed when a bomb explodes in the field in which the evacuated students are standing." *Id.* at page 2. The student showed fellow students the "School Shootings" entry. *Id.* The student claimed that the "School Shootings" entry was one story among a number of stories, poems and musings contained in the student's notebook. *Id.* at page 1.

The police officers placed the student under arrest for Falsely Reporting an Incident (that a bomb was planted outside the school in an adjacent field). *Id.* at page 2. In finding that the police officers had probable cause to arrest the student, the *Strawn* court stated,

> In this case, it is undisputed that at the time of Strawn's arrest, Holohan "knew about the notebook of fictional stories and songs, and the fact that the notebook had been given to other students and discussed in the library." Additionally, Holohan had read the contents of Strawn's notebook, including the "School Shootings" story, which described a bombing at a school called Averill Park.

17

> Based on this knowledge alone, Holohan had probable cause to arrest Strawn for
> the felony of Falsely Reporting an Incident in the Second Degree.

*Id.* at page 3 (internal citations omitted).   Moreover, the court found that the fact the officer

consulted with the District Attorney's office prior to the student's arrest, "while not dispositive

of the issue, is a factor supporting the reasonableness of [the officer's] actions."  *Id.* at page 5.

    (c) <u>D.F. v. Bd. of Educ. of Syosset Central School District</u>

      A third similar fact pattern is found in *D.F. v. Bd. of Educ. of Syosset Cent. Sch. Dist.*,

386 F.Supp.2d 119 (E.D.N.Y. 2005).   In *D.F.*, a twelve-year-old boy wrote in a journal a

fictional story entitled "Costume Party," which the boy says he modeled after the horror movie

"Halloween."  *Id.* at 123.   In the story, the main character goes on a killing spree, killing

characters described as "mean kids" and "bad kids." *Id.*  Some of the characters in the story were

named after actual students with whom D.F. went to school. *Id.*  The school subjected D.F. to

psychological testing without his parents' consent, which resulted in the parents filing a lawsuit

for a fourth amendment violation for unreasonable search and seizure. *Id.* at 128.   In deciding

that the school officials were justified in testing D.F., the court found that D.F.'s story "with its

graphic depictions of a child brutally murdering his classmates, gave Defendants reasonable

grounds for fearing that Plaintiff might carry out the acts he described." *Id.*  The court found no

violation of the Fourth Amendment because "it was reasonable to believe that [D.F.] was capable

of violent acts toward his fellow students." *Id.* at 128-129.

    (d) <u>The case at hand</u>

      *1.  Fear expressed by school staff and students*

      Similar to the *Ryburn* case described above, the assistant principal in the case at hand

contacted police with concerns for the safety of her students based on B.J.'s writings and

drawings. (UMFs 26, 27)  In addition to the writings and drawings found in B.J.'s backpack, the

assistant principal's concern for the safety of her students was based on a note from a fellow student of B.J.'s and an email from one of B.J.'s teachers. The fellow student stated that B.J. had threatened to kill her, that B.J. had told her that she was on B.J.'s "hit list," and that B.J. told her he was going to bring a knife or gun to school and kill her. (UMF 19) The fellow student also stated that B.J.'s statement caused her to fear coming to school. (UMF 19) The email from the teacher, which was what prompted the assistant principal to have B.J. brought to her office, stated that two female students in her class stated that they were afraid of B.J. because he was making a list and one of the girl's names was on the list. (UMF 20). The teacher was also concerned that B.J's hands were shaking. (UMF 20) The assistant principal turned over a copy of the handwritten note and the email to Lt. Lopez. (UMF 18)

In addition to expressing fear for her staff and students on the day the drawings were found (September 7, 2010), the assistant principal continued to relay her ongoing fear for the safety of her staff and students. On September 8, 2010, the assistant principal heard that B.J. had been attempting to leave St. Vincent's into the custody of another minor, B.J.'s girlfriend. (UMF 25) The assistant principal was told the girlfriend was afraid of B.J. (UMF 25) Lt. Lopez was contacted by the Assistant Superintendent Dr. Trujillo who told Lt. Lopez that Assistant Principal Salazar had contacted him to express his fear, as well as the fear of others at the high school, that B.J. would come to the school and act out what he had written and drawn. (UMF27). Compounding that fear was a fire alarm that sounded and an anonymous phone call that came in that warned of a person on campus with a gun. (UMFs 42-43) Lt. Lopez was informed of the fire alarm and the phone call. (UMFs 42-43)

2.      *Actions of B.J.'s custodial parent*

Also similar to the *Ryburn* case, B.J.'s custodial parent was not acting as a normal parent would act in similar situations.  While in a normal parent-teenager situation one would expect the parent to act like an adult in the situation in which her son was asked about his mental state, C.J. acted like a child.  She placed her head in B.J.'s lap while he comforted her, and she cried that she could not be "without" B.J. (UMF 21)  The next day, when she thought the police were at her door, she hid with B.J. and never called the police after that encounter to find out what was going on. (UMF 41)  Furthermore, during the initial meeting with B.J., school officials, and Lt. Lopez, B.J.'s mother stated that she was fearful of B.J.'s violent tendencies and she showed Lt. Lopez a bruise that she claimed B.J. had inflicted on her when he placed his hand around C.J.'s throat and grabbed her arms. (UMF 13, 16)  Common sense would lead a police officer to believe that C.J. could not control her son, and the fact that he had been released to her was no guarantee that he would not return to the school to act out the events depicted in the drawings and writings that contained names of fellow students.

> 3.  *Threatening writings and drawings with actual school and student names*

Like the teenager in *Strawn*, B.J. claimed his drawings were fictitious, yet both the teenager in *Strawn* and B.J. used actual names; Strawn used the name of his high school.  B.J. used the names of fellow students.  Similarly, the student in D.F. used names of fellow students in his fictional story.  The police officers in *Strawn* were entitled to treat the "story" as a threat of real action, and the school officials in the *D.F.* case were entitled to treat D.F.'s "fictional" story as threats against his fellow students.  In both cases, the officials' actions were construed reasonable in light of <u>actual</u> threats having been made (even though the students in both claimed their writings were only a story).  Accordingly, the Defendants in the case at hand had the right to treat the writings and drawings of B.J. as actual threats to fellow students.

The *Strawn* and *D.J.* cases were both decided before the incident at hand. Thus, they not only support a finding of actual probable cause, but also support a finding of arguable probable cause. That is, in light of established case law, Lt. Lopez had a reasonable belief that based on the similarities between the cases, he had probable cause to arrest B.J. Police officers only violate a clearly established right if the right is so thoroughly developed and consistently recognized under the law of the jurisdiction as to be indisputable and unquestioned. *James v. Chavez,* 830 F.Supp.2d 1208, 1267 (D.N.M. 2011). "[Q]ualifed immunity still applies when an officer has reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause." *Id.* (internal quotations and citations omitted). As long as the officer's mistake regarding the application of the law to a particular set of factual circumstances is reasonable, qualified immunity applies. *James*, 830 F.Supp.2d at 1267.

Also relevant to the reasonableness of Lt. Lopez's actions is the post-Columbine environment regarding threats made by students against fellow students. Since 1999, the police have been on heightened watch regarding the potential of students to violently strike out against fellow students. The dangerous terrain over which police officers now base their "real time" decisions is reflected in the following media stories. This is just a small sampling of the knowledge that a reasonable police officer would have with respect to school violence from 1999 to the date of the incident involving B.J.:[2]

Colorado- February 8, 2001—a fourteen-year old who had been bullied was arrested and charged with conspiracy to commit murder. The teenager insisted he never intended to carry out what was depicted in drawings he made of the inside of his school which included "where the

---

[2] Obviously the particular facts of each of these arrests is not known and the Defendants do not offer these news reports as support of actual probable cause. However, the sampling of new reports provide a lens through which the Defendants' actions should be viewed in deciding arguable probable cause as well as the community caretaker exception described below.

best vantage point might be for someone with a gun." Police stated "[t]hese kinds of threats have to be taken seriously." http://abcnews.go.com/US/story?id=94145&page=1

Kansas- February 5, 2001—three teenagers were charged with conspiracy to commit murder after a fellow student overhead two of the youths talking about their plan to shoot up the school. http://articles.cnn.com/2001-02-05/us/kansas.students_1_three-students-columbine-style-attack-columbine-high-school-massacre?_s=PM:US

California- March 17, 2001—a fifteen-year was old was arrested after sending classmates an email detailing plans to shoot up the school and kill a teacher. The fifteen-year old claimed it was a "bad joke." The police stated, "[w]e take any violent threats or acts toward schools extremely seriously." http://articles.latimes.com/2001/mar/17/local/me-39040

Texas- October 7, 2004- two teenagers were arrested and charged with making terroristic threats. The teenagers had stated they wanted to "recreate Columbine." http://www.wistv.com/Global/story.asp?S=2400269

New Jersey- April 7, 2006—four teenagers were arrested and charged with making terroristic threats and attempted murder in the plot to kill students and teachers. http://www.mtv.com/news/articles/1528119/students-face-terror-charge-murder-plot.jhtml

Colorado- April 13, 2006—two teenagers charged with felony charges for making terroristic threats for allegedly telling classmates they planned to carry out a Columbine-style shooting at their high school. The authorities admitted they could not be certain if the teenagers truly intended to carry out the threats, "but simply making the threats is enough to warrant the felony charges." The prosecutor stated, "[i]n today's world, we simply must treat threats to carry out school violence very seriously." http://www.plattecountylandmark.com/Article10290.htm

Kansas- April 21, 2006—five teenagers were arrested after one of them discussed a plot on a Web site to go on a shooting spree at their high school.  At least one of the teenagers arrested was perceived as having been "picked on" by fellow students. http://seattletimes.com/html/nationworld/2002944937_webschoolplan21.html

New York- November 29, 2007- three students were arrested after posting threatening remarks on Myspace.com.  The threats were to attack the school on the eleventh anniversary of Columbine- two and a half years in the future—"but the school superintendent didn't take any chances.   She  had  the  students  arrested."  http://www.switched.com/2007/11/29/students-arrested-after-planning-shooting-on-columbine-anniversa/

Indiana- April 19, 2008—a sixteen-year old was arrested on charges of conspiracy to commit murder.  The 16-year old had posted on Myspace.com inflammatory comments calling the shooters in the Columbine shooting "martyrs"; had written "everyone was going to die" on a wall at the school; and had made an entry in his journal that he "wanted to break the current shooting record." http://www.mahalo.com/russell-frantom/

New York- April 2008- two teenagers were arrested for allegedly formulating plans to attack and kill students at a high school.  One of the students had expressed anger at having continually been made fun of or picked on.  A journal was found which contained written accounts stating plans for attack, and naming particular students as targets.  The teenager claimed the journal writings were simply a way for him to vent his anger, and that he never had any intention of carrying out an attack on the school. http://voices.yahoo.com/two-teens-arrested-allegedly-planning-columbine-452881.html?cat=8

Louisiana- April 29, 2009- two teenagers were arrested for terrorizing.  Police found drawings and papers about the April 20, 1999 Columbine High shootings, including poems by

the pair about being bullied. "We found one drawing that had the student blowing the brains out of a particular teacher." Another showed the teenagers "on a school roof celebrating around dead bodies hanging out of windows." The teenagers called their drawings a "fantasy" and a "joke" and claimed they never really planned to go through with it. http://www.cbsnews.com/2100-201_162-592971.html

"The Fourth Amendment's reasonableness inquiry… must account for the 'the schools' custodial and tutelary responsibility' over the students entrusted to their care." *Veronica Sch. Dist. 47J v. Acton,* 515 U.S. 646, 656 (1995).

> School attendance can expose students to threats to their physical safety that they would not otherwise face. Outside of school, parents can attempt to protect their children in many ways and may take steps to monitor and exercise control over the persons with whom their children associate. Similarly, students when not in school, may be able to avoid threatening individuals and situations. During school hours, however, parents are not present to provide protection and guidance, and students' movements and their ability to choose the persons with whom they spend time are severely restricted. Students may be compelled on a daily basis to spend time at close quarters with other students who may do them harm. Experience shows that schools can be places of special danger.

*Morse v. Frederick,* 551 U.S. 393, 424 (2007) (Alito, J., concurring in judgment) (a First Amendment case). In the school setting, the government has a "heightened obligation to safeguard students whom it compels to attend school." *New Jersey v. T.L.O.,* 469 U.S. 325, 353 (1985) (Blackmun, J., concurring in judgment).

A reasonable officer could have believed, in light of the information Lt. Lopez possessed, that he had probable cause to arrest B.J.

> Like prison officials facing a riot, the police on an occasion calling for fast action have obligations that tend to tug against each other. Their duty is to restore and maintain lawful order, while not exacerbating disorder more than necessary to do their jobs. They are supposed to act decisively and to show restraint at the same moment, and their decisions have to be made "in haste, under pressure, and frequently without the luxury of a second chance."

*Durruthy*, 351 F.3d at 1093, *quoting County of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998). Here, the officers were faced with making a close call on a difficult day, under chaotic circumstances. B.J. had drawn and written threatening entries in a notebook--drawings and writings that Lt. Lopez was entitled to treat as actual threats under the case law established as of September 2010. (UMFs 3-11)   While Lt. Lopez learned that B.J. had been released to his mother from St. Vincent's hospital, Lt. Lopez was informed by B.J.'s mother that she was fearful of B.J. (UMFs 13, 16)   The school psychologist informed Lt. Lopez of behavior where C.J. was acting like the child around B.J. (UMF 21)   Indeed, this perception is bolstered by the actions of C.J. when she thought the police were at the door of her home—she hid with her son. (UMF 41) When Lt. Lopez asked B.J. if he was going to hurt or injure himself, he replied "I don't think so" but that sometimes he didn't know what he was thinking in his head. (UMF 12)   When Lt. Lopez then asked B.J. if he thought he could hurt someone, or any of the fellow students on the list, B.J. stated that he did not know. (UMF 14)   At least three students had communicated to school officials that they feared B.J. would harm them. (UMFs 18-20).   Lt. Lopez was told that the staff and students at Espanola Valley High School were fearful that B.J. would return to the school and act what was depicted in his writings and drawings. (UMF 37)   Lt. Lopez was told by B.J.'s girlfriend that B.J. sounded "distant" the night before. (UMF24)   A fire alarm went off at the school. (UMF 42)   There was a report of someone at the school with a gun.  (UMF 43)    Finally, like the officer in *Strawn*, both Lt. Lopez and Sgt. Gallegos consulted with other law enforcement agencies (the Juvenile Probation Office and the Ohkay Owingeh Tribal Court Judge) prior to B.J.'s arrest, which "while not dispositive of the issue, is a factor supporting the reasonableness of [the officer's] actions." *Strawn*, at page 5, attached hereto as Exhibit I (UMFs 30-37, 39)

Lt. Lopez, and by extension Sgt. Gallegos, had arguable probable cause to arrest B.J.  As the Court stated in the factually-similar *Strawn* case, "[i]n the wake of the incident at Columbine, as well as other incidents of school violence, [the officer's] actions were quite appropriately, marked with a heightened sense of urgency." *Strawn*, at page 5, attached hereto as Exhibit I.

### 3. *Defendants did not violate B.J.'s constitutional rights by handcuffing B.J.*

When an officer moves for qualified immunity on an excessive-force claim, "a plaintiff is required to show that the force was impermissible (a constitutional violation) and that objectively reasonable officers could not have thought the force constitutionally permissible (violated clearly established law)." *Cortez*, 478 F.3d at 1128.   The arresting officer simply handcuffed B.J. without incident.   Plaintiffs admit that B.J. was not physically injured instead arguing the "handcuffing was malicious due to its very use." *See* Plaintiffs' Answer to Defendants' Interrogatory NO. 11, attached hereto as Exhibit J.  Based on existing case law, use of handcuffs in this manner is constitutionally permissible. *See e.g. Smith v. Kenney,* 678 F.Supp.2d 1093, 1166 (D.N.M. 2009) (use of handcuffs not enough to support an excessive-force claim particularly where officer was never told they were overly tight).

Furthermore, the excessive-use-of-force claim fails regardless of whether the arrest if found to be lawful.

> In cases where officers use force in effecting an arrest and the arrest is lawful, there will be no excessive-use-of-force claim if the officers use an amount of force commensurate with the circumstances. On the other hand, if the officer's use of force was greater than necessary to effect the lawful arrest, an excessive-use-of-force claim will lie. If, however, the arrest is unlawful, an excessive-use-of-force claim will lie only if the amount of force that the officer used was more than would have been justified if the detention had been lawful.

*Id.* at 1161.

### B. Defendants had the right to take B.J. into custody under the community caretaking exception.

The community caretaking exception to the requirement of arguable probable cause applies where an officer is acting to help those in danger and requires only a reasonable belief that an emergency exists requiring his or her attention. *See United States v. Quezada,* 448 F.3d 1005, 1007 (8th Cir. 2006).  "Further, the community caretaker exception carries with it the right to seize an individual, regardless of any suspected criminal activity, where the governmental interest in a police officer's exercise of his or her community caretaker function outweighs the individual's interest in being free from arbitrary government interference." *Samuelson v. City of New Ulm*, 455 F.3d 871, 877 (8th Cir. 2005).  Under the community caretaker exception, officers may seize an individual in order to ensure the safety of the public when "articulable facts indicate the need to assure the safety of the public." *St. John v. McColley*, 653 F.Supp.2d 1155, 1162 (D.N.M. 2009).

Community caretaking functions are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statue." *United States v. Garner*, 416 F.3d 1208, 1212 (10th Cir. 2005) *quoting Cady v. Dombrowsk*i, 413 U.S. 433, 441 (1973). The facts of this case justify the arrest of B.J. even without arguable probable cause because the Defendants were acting within their community caretaking function.  They were not searching B.J.'s home without a warrant to obtain evidence.  They were simply trying to eliminate the perceived threat that he posed to his fellow students at Espanola High School.  In light of societal concerns about threats made by students against other students that have allegedly bullied them, and in light of the special caretaker function the government has with respect to children in a school setting, the Defendants' actions were reasonable to ensure the safety of the students in the government's care at Espanola Valley High School.

**WHEREFORE,** Defendants respectfully request that the Court grant the Defendants summary judgment in their favor on Count I of the complaint pursuant to the doctrine of qualified immunity.

Respectfully Submitted,
*Electronically Filed*
*/S/   Mark A. Basham*
Katherine A. Basham
Mark A. Basham
Basham & Basham, P.C.
Attorneys for Defendants
2205 Miguel Chavez Rd., #A
Santa Fe, New Mexico 87505
(505) 988-4575; kbasham@bbpcnm.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was mailed to Shannon Kennedy, The Kennedy Law Firm, at 1000 Second Street, NW, Albuquerque, New Mexico, 87102, on this 9th day of November, 2012.

*Electronically Filed*
*/S/   Mark A. Basham*
_____

Mark A. Basham