

FOCUS - 146 of 261 DOCUMENTS

RAYMOND STRAWN, Plaintiff, v. K.E. HOLOHAN, Defendant.

1:04-CV-1292 (GLS/DRH)

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK

2008 U.S. Dist. LEXIS 618

January 4, 2008, Decided
January 4, 2008, Filed

**COUNSEL:**  [*1] For Raymond Strawn, Plaintiff: Elmer R. Keach, III, LEAD ATTORNEY, Office of Elmer R. Keach, III, Amsterdam, NY.

For K.E. Holohan, Defendant: Roger W. Kinsey, Office of Attorney General - Albany, Albany, NY.

For Joseph Ahearn, Danielle Neroni, Defendant: Thomas J. O'Connor, LEAD ATTORNEY, Napierski, Vandenburgh Law Firm, Albany, NY.

**JUDGES:** Gary L. Sharpe, U.S. District Judge.

**OPINION BY:** Gary L. Sharpe

**OPINION**

**MEMORANDUM-DECISION AND ORDER**

**I. Introduction**

Plaintiff Raymond Strawn brings this action pursuant to *42 U.S.C. § 1983*, alleging that Kevin Holohan, a New York State Police Trooper, violated his *Fourth Amendment* rights. Pending under *Federal Rule of Civil Procedure 56* is Holohan's motion for summary judgment. *See Dkt. No. 33.* For the reasons that follow, Holohan's motion for summary judgment is granted.

**II. Facts**

The facts, construed in the light most favorable to Strawn, are as follows. On December 18, 2001, Trooper Kevin Holohan and Investigator Michael Zwingelberg of the New York State Police were dispatched to investigate a situation at Averill Park High School, following a report by a school administrator. *See Holohan's Statement of Material Facts Pursuant to N.D.N.Y. R. 7.1(a)(3)* (hereinafter "Holohan SMF")  [*2] *PP 1-3; Dkt. No. 33.* Earlier that day, Rebecca Harris, a classmate of Strawn's, told the school guidance counselor, Tara Arsenault, about a notebook Strawn had showed her and comments Strawn had made to her. *See Holohan SMF P 7; Dkt. No. 33.* Arsenault relayed the information to school administrators, including Assistant Principal Colleen Gomes. *See Holohan SMF PP 9-10; Dkt. No. 33.* Gomes called Strawn into her office, where she asked him about his notebook. *See Holohan SMF P 10; Dkt. No. 33.* Strawn volunteered to show Gomes his notebook, and Gomes read an entry entitled "School Shootings." [1] *See Holohan SMF PP 11-12; Dkt. No. 33.* Upon learning of the "School Shootings" story, Principal Nancy Noonan, who was a school administrator during the Columbine school shootings, decided to call the police. *See Holohan SMF PP 15, 16; Dkt. No. 33.*

> 1   The "School Shootings" story was one of a number of stories, poems, and musings contained in Strawn's notebook. *See Strawn's Counter Statement of Material Facts Pursuant to N.D.N.Y. R. 7.1(a)(3)* (hereinafter "Strawn Counter SMF") *P 4; Dkt. No. 45.*

When Holohan arrived at Averill Park, the school was on "lockdown." *See Holohan SMF P 17; Dkt. No. 33.* After  [*3] speaking with administrators, Holohan learned that Strawn had shared and discussed his notebook with two female students, Holly Bermas and Rebecca Harris. *See Holohan SMF P 5; Dkt. No. 33; Strawn Counter SMF P 3; Dkt. No. 45.* Among the stories that



Case 1:12-cv-00565-KG-SMV   Document 27-5   Filed 11/09/12   Page 2 of 6

Page 2
2008 U.S. Dist. LEXIS 618, *

Strawn shared with the girls was "School Shootings," which described "the perfect plan" in which Averill Park students are tricked into evacuating the school due to a bomb threat only to be killed when a bomb explodes in the field in which the evacuated students are standing. See Holohan SMF PP 12, 13; Dkt. No. 33. Strawn discussed "School Shootings" with the girls on more than one occasion during the three weeks preceding December 18. See Holohan SMF PP 4-6; Dkt. No. 33.

After Holohan spoke with Assistant Principal Gomes, he met with Strawn and read Strawn's notebook. See Holohan SMF PP 18-19; Dkt. No. 33. Holohan discussed the "School Shootings" story with Strawn. See Holohan SMF P 20; Dkt. No. 33. Strawn told Holohan and Gomes that he had attempted suicide in the past. See Holohan SMF P 25; Dkt. No. 33. Holohan felt that Strawn "showed a lot of indicators of [the event] being an actual real incident." See Holohan SMF P 26; Dkt. No. 33. [*4] For instance, he described Strawn as being evasive in answering questions and revealing a history of suicidal tendencies. See id. Holohan also felt that Strawn's notebook contained very graphic content. See id.

While Holohan was interviewing Strawn, Investigator Zwingelberg arrived at the school. See Holohan SMF P 27; Dkt. No. 33. Zwingelberg talked with Principal Noonan, who told him that Strawn had brought a gun to his previous school in California. See Holohan SMF P 28; Dkt. No. 33. [2] Zwingelberg reviewed Strawn's notebook for himself and was very concerned after reading "School Shootings." See Holohan SMF PP 31-32; Dkt. No. 33. [3] Meanwhile, Holohan conducted a search of the school with his canine partner. See Holohan SMF P 29; Dkt. No. 33.

> 2   Strawn contends that he never told Noonan that he had brought a gun to school in California. See Strawn's Resp. to Holohan SMF P 28; Dkt. No. 45. However, it is not disputed that Noonan told Zwingelberg that Strawn had done so. Id.
>
> 3   Holohan claims that Zwingelberg spoke briefly with the two girls, Bermas and Harris, who brought the matter to the attention of school personnel, and that the girls were crying and very upset. See Holohan SMF P 30; [*5] Dkt. No. 33. However, Strawn presents evidence suggesting that Zwingelberg never actually talked to the girls on December 18th. See Strawn's Resp. to Holohan SMF P 30; Dkt. No. 45.

Zwingelberg treated the events of the day as a serious threat. See Holohan SMF PP 34-37; Dkt. No. 33. As the senior officer on site, Zwingelberg consulted the Rensselaer County District Attorney's office about the situation. See Holohan SMF PP 38, 40; Dkt. No. 33. Zwingelberg and Holohan subsequently decided to place Strawn under arrest. See Holohan SMF P 41; Dkt. No. 33. Zwingelberg filled out the arrest complaint, and Holohan signed it. See Holohan SMF P 44; Dkt. No. 33. Strawn was arrested for Falsely Reporting an Incident in the Second Degree, in violation of N.Y. PENAL LAW § 240.55.

Strawn was taken to Sand Lake Police barracks and processed. See Holohan SMF P 45; Dkt. No. 33. After processing, Zwingelberg took him to be arraigned before Town Justice Mort Schulman, who remanded Strawn to Rensselaer County Jail without bail and ordered a psychiatric evaluation. See Holohan SMF P 46; Dkt. No. 33. Holohan did not escort Strawn to the barracks, nor did he attend Strawn's arraignment or preliminary hearing. [*6] See Holohan SMF P 47; Dkt. No. 33. At Strawn's preliminary hearing on December 24, Judge Schulman heard testimony from Bermas and Harris and ultimately concluded that probable cause existed to believe Strawn committed the crime of Falsely Reporting an Incident in the Second Degree. See Holohan SMF PP 48-50; Dkt. No. 33. The Town Court ordered that Strawn be held without bail pending trial. See Holohan SMF P 51; Dkt. No. 33. On February 4, 2002, Strawn was released from jail into home confinement. See Holohan SMF P 52; Dkt. No. 33. Strawn was eventually acquitted of all criminal charges on June 10, 2002. See Holohan SMF P 54; Dkt. No. 33. [4]

> 4   In addition to the facts recited above, both parties have presented a host of additional facts which, although descriptive of the events of December 18, and of past and subsequent events, are largely irrelevant to the existence of probable cause. To a certain extent, both parties appear to have lost sight of the fact that the existence of probable cause depends on the knowledge of the arresting police officer at the time of the arrest. It is baffling to the court why the parties have spent so much time establishing what Strawn conveyed to the girls, [*7] what the girls thought of Strawn's actions, and what knowledge was possessed by the school administrators, and so little time explaining precisely what Holohan knew of these facts at the time of Strawn's arrest. The knowledge of witnesses is of critical importance, of course, but only insofar as that knowledge is imparted to the arresting officer.

Subsequently, Strawn commenced the instant suit, alleging claims of false arrest and malicious prosecution in violation of the Fourth Amendment. [5]

> 5   Strawn also alleged a cause of action sounding in excessive bail. However, that claim has

been withdrawn. *See Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J., p. 30; Dkt. No. 49.*

### III. Discussion

#### A. Standard of Review-Motion for Summary Judgment

The standard for the grant of summary judgment is well-established, and will not be repeated here. For a full discussion of the standard, the court refers the parties to its previous opinion in *Bain v. Town of Argyle, 499 F. Supp. 2d 192, 194-95 (N.D.N.Y. 2007).*

#### B. Probable Cause

Holohan seeks summary judgment dismissing Strawn's false arrest and malicious prosecution claims on the grounds that the arrest and prosecution of Strawn were supported by probable cause. [*8] A claim for false arrest brought pursuant to *42 U.S.C. § 1983* "rests on the *Fourth Amendment* right of an individual to be free from unreasonable seizures, including arrest without probable cause." *Cea v. Ulster County, 309 F. Supp. 2d 321, 329 (N.D.N.Y. 2004)* (internal quotation marks and citation omitted). "To establish a false arrest claim under either federal or New York law, a plaintiff must demonstrate that (i) the defendant intended to confine [the plaintiff], (ii) the plaintiff was conscious of the confinement, (iii) the plaintiff did not consent to the confinement, and (iv) the confinement was not otherwise privileged." *Id.* (internal quotation marks and citation omitted). "An arrest is otherwise privileged, if there was probable cause to arrest." *Id.* (internal quotation marks and citation omitted). In other words, the existence of probable cause "constitutes justification and is a complete defense to an action for false arrest." *Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)* (internal quotation marks and citation omitted).

The elements of malicious prosecution under *42 U.S.C. § 1983* and New York law are the same. *See Cook v. Sheldon, 41 F.3d 73, 79 (2d Cir. 1994).* To prevail [*9] on a malicious prosecution claim, a plaintiff must establish that: (1) the defendant initiated a criminal proceeding; (2) the proceeding was terminated favorably to the plaintiff; (3) there was no probable cause for the criminal charge; and (4) the defendant acted maliciously. *See Rothstein v. Carriere, 373 F.3d 275, 282 (2d Cir. 2004).* As with false arrest, the existence of probable cause is a complete defense to a malicious prosecution claim. *See Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003).*

Probable cause to arrest exists when a police officer has "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Savino, 331 F.3d at 76* (quotation and citation omitted). Similarly, probable cause to commence a criminal proceeding exists when a defendant has "knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of." *Rounseville v. Zahl, 13 F.3d 625, 629 (2d Cir. 1994)* (quotation and citation omitted). "Whether probable cause exists depends [*10] upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford, 543 U.S. 146, 152, 125 S. Ct. 588, 160 L. Ed. 2d 537 (2004)* (citing *Maryland v. Pringle, 540 U.S. 366, 371, 124 S. Ct. 795, 157 L. Ed. 2d 769 (2003)).* Moreover, "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Id. at 153* (citing *Whren v. United States, 517 U.S. 806, 812-13, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996)).* Probable cause can be determined as a matter of law if "the pertinent events and the knowledge of the officers are not in dispute." *Thompson v. Sweet, 194 F. Supp. 2d 97, 101 (N.D.N.Y. 2002)* (quotation and citation omitted).

In this case, it is undisputed that at the time of Strawn's arrest, Holohan "knew about the notebook of fictional stories and songs, and the fact that the notebook had been given to other students and discussed in the library." *Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J., p. 18; Dkt. 49.* Additionally, Holohan had read the contents of Strawn's notebook, including the "School Shootings" story, which described a bombing at a school called Averill Park. *See Strawn's Resp. to Holohan SMF PP 13, 19, 20; Dkt. 45.* Based upon this knowledge alone, [*11] Holohan had probable cause to arrest Strawn for the felony of Falsely Reporting an Incident in the Second Degree. New York Penal Law provides that:

> A person is guilty of falsely reporting an incident in the second degree when, knowing the information reported, conveyed or circulated to be false or baseless, he or she:
>
> 1. Initiates or circulates a false report or warning of an alleged occurrence or impending occurrence of a[n] . . . explosion . . . under circumstances in which it is not unlikely that public alarm or inconvenience will result. . . .

*N.Y. PENAL LAW § 240.55.* Here, Holohan knew that Strawn had circulated a story (in other words, a "report") which warned of an impending bomb, or explosion. Moreover, under the circumstances-a high school setting,

post- Columbine-it was not unlikely that public alarm would result.

Strawn contends that sharing a story with fellow students is not the functional equivalent of a bomb threat. However, considering that the story referred to a school called Averill Park, a reasonable officer could conclude that the story constituted a "warning." Nothing in the statute requires that the warning be explicit. The threat or warning here was implicit in [*12] the use of the name "Averill Park," the first-person narrative, [6] and the description of the events as a "perfect plan." Moreover, the trivial differences between the "real" Averill Park high school, and the one described in Strawn's story, do not alter the tone, import, or message of Strawn's writing. Holohan could reasonably conclude that Strawn, in writing the story and sharing it with fellow students, had warned the students that he planned to bomb the Averill Park high school.

> 6    "School Shootings" alternates between a third-person and a first-person narrative. The story begins in the third person, as the narrator describes how "one kid got the perfect plan for a 'school shooting' and he didn't get caught for it." See Strawn Notebook, attached as Exhibit D to the Affirmation of Elmer Keach; Dkt. No. 44. It is later revealed that the narrator himself is the "kid" referred to in the introductory paragraph: "It was the most terrible thing that has ever happen [sic] at a school. It was the most perfect thing I have ever done." Id.

On the issue of "public alarm," Strawn argues, without citation to the record, [7] that no one took him seriously, and that no one was alarmed by his comments. [*13] See Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. p. 15; Dkt. 49. This argument is belied by the very fact that one of the girls with whom Strawn shared his story brought the story to the attention of school administrators. The administrators, likewise alarmed, called the police.

> 7    Strawn's brief in opposition to Holohan's motion contains virtually no citations to the voluminous record. To the extent practicable, the court has searched the record for support for Strawn's assertions. However, counsel are reminded that Rule 56 "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute." Amnesty Am. v. Town of West Hartford, 288 F.3d 467, 470 (2d Cir. 2002).

Strawn notes that Assistant Principal Gomes testified in her deposition that she did not believe that a bomb was present in the school. See Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. p. 5; Dkt. 49. However, Strawn has not directed the court's attention to any evidence suggesting that Gomes conveyed her lack of concern to the police. Gomes' beliefs are only relevant to the extent that they were expressed to Holohan. Moreover, even assuming that school administrators [*14] were not "alarmed," the students who read "School Shootings" assuredly were, as evidenced by the decision to report the story to school administrators. [8]

> 8    Strawn's brief states-again, without citation to the record-that Harris and Bermas testified that they were not scared when reading Strawn's stories, and that they did not take the purported threats in the stories seriously. See Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. p. 4; Dkt. 49. Such after-the-fact testimony is not relevant to the probable cause determination, because it is nowhere stated that Holohan was informed that the girls were not alarmed. Given that one of the girls reported Strawn's conduct to school administrators, Holohan could reasonably infer that the girls were, in fact, alarmed.

One final contention merits discussion. Strawn suggests that Holohan's investigation was not sufficiently thorough, and that his failure to interview Harris and Bermas vitiates probable cause. While a complaining witness may often be the best source of information, an investigating officer may obtain probable cause for an arrest through other avenues. In assessing probable cause, it was permissible for Holohan to consider the accounts [*15] of Gomes and other school personnel, regardless of whether such statements might have constituted hearsay evidence. See Velaire v. City of Schenectady, 862 F. Supp. 774, 780 (N.D.N.Y. 1994) ("[A] police officer's judgment as to probable cause, unlike a criminal complaint, may be based on hearsay evidence, upon suspicious circumstances and upon probabilities."). A police officer has probable cause to arrest if the information he has gathered was obtained from a person "who it seems reasonable to believe is telling the truth." Miloslavsky v. AES Engineering Soc., Inc., 808 F. Supp. 351, 355 (S.D.N.Y. 1992). In this case, it was reasonable for Holohan to trust the statements made by school administrators. Cf. Gardiner v. Incorporated Village of Endicott, 50 F.3d 151, 156 (2d Cir. 1995) (holding, with respect to the seizure of a student, that it was objectively reasonable for police to rely on statements made by a school administrator).

It is true that Holohan might have done more to investigate the matter. Contrary to Strawn's suggestion, however, this does not mean that the arrest was the sort of "hasty, unsubstantiated arrest[]" condemned by the court in Ahlers v. Schebil, 188 F.3d 365, 371 (6th Cir.

*1999).* [*16] In fact, the court in that case noted that "[o]nce probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused." *Id. at 371.* In other words, unless an officer has turned a blind eye to exculpatory evidence, an investigation may be deemed complete once probable cause is established. *See id. at 372; see also Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997)* ("Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest."). In this case, as stated above, it is undisputed that, based upon interviews with school administrators and Strawn himself, Holohan knew that Strawn had written a story called "School Shootings" which referenced events at a high school called Averill Park, and that Strawn had shared the story with fellow students, who subsequently notified school personnel. Once Holohan was possessed of this information, he had probable cause to arrest Strawn.

Accordingly, because Holohan's arrest of Strawn was supported by probable cause, Strawn's [*17] claim for false arrest must be dismissed. Likewise, the claim for malicious prosecution must be dismissed for the same reason.

### C. Qualified Immunity

Because the court has determined that Strawn's arrest was supported by probable cause, it need not address the defense of qualified immunity. However, even if the court had concluded that Holohan did not have probable cause to arrest Strawn, the court would hold that Holohan is entitled to qualified immunity.

Pursuant to the doctrine of qualified immunity, a police officer is shielded from liability for "official conduct that does not violate clearly established statutory or constitutional rights of which a reasonable person would have known . . . insofar as it was objectively reasonable for such [police officer] to believe, even if mistakenly, that [his] conduct did not violate such rights." *Ricciuti, 124 F.3d at 127* (internal citations and quotations omitted). Thus, in the false arrest context, a police officer is entitled to qualified immunity where: "(1) it was objectively reasonable for the officer to believe there was probable cause to make the arrest, or (2) reasonably competent police officers could disagree as to whether there was [*18] probable cause to arrest." *Id. at 128.* In evaluating the defense of qualified immunity, courts apply a "forgiving standard," which protects "all but the plainly incompetent or those who knowingly violate the law." *Provost v. City of Newburgh, 262 F.3d 146, 160 (2d Cir. 2001)* (quotation and citation omitted).

In this case, for the very same reasons discussed above as establishing probable cause, it was objectively reasonable for Holohan to believe that there was probable cause for the arrest of Strawn. This conclusion is bolstered by the exigent circumstances Holohan faced. In the wake of the incident at Columbine, as well as other incidents of school violence, Holohan's actions were, quite appropriately, marked with a heightened sense of urgency. This is not to suggest that police investigations may be undertaken haphazardly or conducted without proper respect for constitutional rights; it is merely to say that Holohan acted reasonably in treating a potential threat very seriously and investigating it in an expeditious manner. *See Cohen v. Dubuc, No. 3:99-cv-2566, 2000 U.S. Dist. LEXIS 22913, 2000 WL 1838351, *5 (D. Conn. 2000)* (officer who arrested student was entitled to qualified immunity where "[e]xigent circumstances [*19] existed and it was more than reasonable to act with all due haste"); *see also Be Vier v. Hucal, 806 F.2d 123, 127 (7th Cir. 1986)* (noting that "probable cause is a function of information and exigency"). Moreover, the fact that Zwingelberg [9] consulted with the District Attorney's office prior to Strawn's arrest, while not dispositive of the issue, is a factor supporting the reasonableness of Holohan's actions. *See Dale v. Kelley, 908 F. Supp. 125, 137-38 (W.D.N.Y. 1995)* (qualified immunity supported by fact that arresting officer acted at the direction of an Assistant District Attorney).

---

9 Under the collective knowledge doctrine, for purposes of assessing probable cause, the knowledge of one officer is presumed shared by all. *Savino v. City of New York, 331 F.3d 63, 74 (2d Cir. 2003).*

---

Accordingly, Holohan would be entitled to qualified immunity even if the arrest and prosecution of Strawn were not supported by probable cause.

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Holohan's motion for summary judgment is **GRANTED,** and it is further

**ORDERED** that Strawn's claims for false arrest, malicious prosecution, and excessive bail are dismissed, and it is further

**ORDERED** that [*20] the Clerk enter judgment and close the case.

**IT IS SO ORDERED.**

Dated: January 4, 2008

Albany, New York

of each injury. As to each injury: a) when did you complain to Defendant Gallegos and/or any other officer of the Espanola Police Department that you were injured or that the actions of the officer was hurting you and describe said officer(s)' response to your complaints; b) list any pre-existing illness, injury or condition which was allegedly aggravated or affected by the injuries; c) whether or not you have fully recovered from each injury, and if so, the approximate date upon which you were fully recovered from each injury; d) identify and describe any pain which you are still experiencing as a result of the arrest; and e) state whether any disability or physical injury or impairment has been determined by a medical doctor to be permanent.

**ANSWER:**

Plaintiff has produced a report from Gilbert Kliman, M.D. which fully describes the injuries suffered. Plaintiff alleges the handcuffing was malicious due to its very use. There was no risk to the officers from B.J. he had no weapons on him. Indeed, at the time he was handcuffed, he was visiting a health care provider.

**Interrogatory No. 12.:**

Describe in detail the factual allegation in your complaint that the City of Espanola had prior knowledge:

a) of alleged two previous civil rights judgments against Defendant Pacheco;

b) that Defendant Pacheco allegedly had previously violated the Fourth Amendment rights of two citizens in the Village of Questa and of another Espanola High school student; and

c) that Defendant Pacheco allegedly had been fired from Taos Pueblo Police Department, Tesuque Pueblo Police Department, and Santa Clara Police Department due to acts of dishonesty and unlawful seizures. Identify any documents upon which you rely in your answer to this interrogatory.



EXHIBIT J