# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

T.J. and C.J., on behalf of their minor child B.J.
    **Plaintiffs,**

v.
                           **Case No.  12-CV-00565 RB/LFG**

Danny Pacheco, et al.
    **Defendants.**

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON COUNT I OF PLAINTIFFS' COMPLAINT BASED ON QUALIFIED IMMUNITY [DOCUMENT 27]

COME NOW the Defendants, by and through their attorneys, Basham & Basham, P.C. (Katherine A. Basham, Esq.), and hereby offer this Reply in support of their motion for summary judgment in their favor on Count I of the complaint based on the doctrine of qualified immunity [Document 27].

### I.  ADMITTED FACTS

In their Response to Defendants' Motion for Entry of Summary Judgment on Count I of Plaintiffs' Complaint Based on Qualified Immunity (herein Response) [Document 47], Plaintiffs admit or do not dispute the following facts:

**1.** On September 7, 2010, B.J. had in his possession, and had brought to school in his backpack: (1) three lists of names composed by B.J, one of which was titled "list for hell" containing names of fellow students; (2) drawings by B.J. that depicted the following: a disturbing scene of a "shack of blood," a beheading by a man wearing a t-shirt emblazoned with the words "unleash hell," a bloody scene in a room that appeared to be a chemistry lab, a torture room with two people in restraints and two heads on a "head shelf," and a graveyard with four headstones containing names of fellow students with the words "to HELL" at the bottom.  B.J. stated the pictures were of scenes from a movie he wanted to make.  B.J. stated he used names of actual

students on the list and the tombstones because they were students he would see on a daily basis who would "bug" him. [Defendants Undisputed Material Facts (UMFs) 1-11 admitted on page 4 of Response]

**2.** Lt. Lopez asked B.J. if he was going to hurt or injure himself and he replied "I don't think so" but that sometimes he didn't know what he was thinking in his head. [UMF 12 admitted on page 4 of Response]

**3.** Lt. Lopez was informed by C.J. that B.J.'s father T.J. lived in Georgia.[1] [UMF 17 admitted on page 5 of the Response]

**4.** Assistant Principal DeVanna Ortega showed Lt. Lopez a handwritten note dated March 2, 2010, purportedly authored by a student (S.M.) which stated that B.J. was threatening her and telling her he was going to kill her. According to the note, B.J. told S.M. that she was on B.J.'s "hit list" and that he was going to bring a knife or gun to school and kill her. According to the note, the student feared coming to school because of B.J..[2] [UMF 18-19; no evidence presented by Plaintiffs to contradict the two affidavits that the note was turned over to Lt. Lopez]

**5.** Ms. Ortega also showed Lt. Lopez an email sent to Gloria Champion from teacher Josefina Litera at 11:44 AM on September 7, 2010. In it, Ms. Litera stated that a female student observed B.J. making a list and that her name was on the list. The email stated that the female student told Ms. Litera that she was afraid of B.J., and Ms. Litera also noticed that B.J.'s hands were

---

[1] Plaintiffs state they deny this fact "as immaterial" which can only be equivalent to an admission since the affidavit of C.J. does not contradict it.

[2] Plaintiffs deny this material fact but offer no proof that Lt. Lopez was not given this note. Both Lt. Lopez and Assistant Principal DeVanna Ortega have testified that the note was given to Lt. Lopez by Ms. Ortega. No other fact need be proved for purposes of a qualified immunity motion. Plaintiffs also complain that the note is "triple hearsay" and "unauthenticated." However, hearsay evidence may be used to establish arguable probable cause. *United States v. Swingler*, 758 F.2d 477, 487 (10th Cir. 1985). Furthermore, authentication is not required. See *Durruthy v. Pastor*, 351 F.3d 1080, 1089 (11th Cir. 2003) (arguable probable cause does not require an arresting officer prove every element of a crime and become a prosecutor).

shaking.[3] [UMF 20; no evidence presented by Plaintiff to contradict the two affidavits that this email was turned over to Lt. Lopez]

6. Lt. Lopez was informed by school psychologist Lloyd Vigil that at one point when Dr. Vigil walked back into the room where B.J. and C.J. were, Dr. Vigil observed C.J. with her head in her son's lap, she was very distraught and B.J. was trying to comfort his mother. C.J. also appeared very distressed at the thought that B.J. may be taken from her for psychiatric care and stated something to the effect that she "needs" B.J. with her. Dr. Vigil was concerned enough about this regressive behavior of a mother towards a son that Dr. Vigil told Lt. Lopez of the mother's behavior and the fact that her behavior concerned Dr. Vigil.[4] [UMF 21; not disputed by Plaintiffs that this occurred]

7. B.J. was transported from the high school to St. Vincent's Hospital by ambulance for a psychiatric evaluation. The next day, on September 8, 2010, Lt. Lopez was informed by Espanola High School Assistant Principal Reuben Salazar that Salazar's daughter received phone calls from B.J. the night before asking that she come and pick him up from the hospital. [UMFs 22-23; admitted on page 6 of the Response]

8. Lt. Lopez also spoke to Mr. Salazar's daughter who confirmed that B.J. had called her from the hospital the night before asking for a ride home. She described B.J. as sounding "distant" on the telephone. Ms. Ortega also heard from Mr. Salazar that his daughter had received phone calls from B.J. the night before asking the daughter to come and pick him up from the hospital. Mr. Salazar told Ms. Ortega that he was concerned for the safety of his daughter, a student at the high school. Ms. Ortega told school resource officer Danny Pacheco of the fear that the staff and

---

[3] Plaintiffs deny this fact "as immaterial" (but offer no proof to contradict it) and "contains hearsay statements" (which may form the basis of arguable probable cause).
[4] Plaintiffs deny this fact "as immaterial" which can only be equivalent to an admission since the affidavit of C.J. does not contradict it.

students had that B.J. was no longer at the hospital and would return to school to act out what he had written and drawn. [UMF 24-26; admitted on page 6 of the Response and/or no evidence presented by Plaintiffs to contradict the affidavits signed by school personnel and Lt. Lopez]

**9.** Lt. Lopez was contacted by the Assistant Superintendent Dr. Trujillo who told Lt. Lopez that Assistant Principal Salazar had contacted him to express his fear, as well as the fear of others at the high school, that B.J. would come to the school and act out what he had written and drawn. [UMF 27; no evidence presented by Plaintiffs to contradict Lt. Lopez's statement that he was so contacted by Dr. Trujillo]

**10.** Lt. Lopez spoke to Juvenile Probation Officer (JPO) Martha Fernandez at the Espanola Probation Office and requested permission to arrest B.J. JPO Fernandez approved the Juvenile Statement of Probable Cause and Complaint.[5] [UMF 30; no evidence presented to contradict Lt. Lopez's statement that he was given said permission by JPO Fernandez]

**11.** After receiving approval from JPO Fernandez to arrest B.J., Lt. Lopez asked Espanola Police Office Richard Gallegos to make contact with the Ohkay Owingeh Police Department and ask permission to go to B.J.'s residence in Ohkay Owingeh Pueblo to arrest B.J.. The Ohkay Owingeh Tribal Court Judge gave Sgt. Gallegos permission to arrest B.J. Sgt. Gallegos was accompanied by a tribal police escort and went to B.J.'s home. No one answered the door. B.J. and his mother heard the knocking but hid in the house because they thought it was the police. [UMFs 37-41; admitted on page 7 of the Response and/or no evidence presented by Plaintiffs to contradict these facts supported by affidavits]

---

[5] Plaintiffs deny this fact but offer no proof from JPO Fernandez that she did not so approve the Juvenile Statement of Probable Cause and Complaint. Plaintiffs are in the unique position of being the only ones that can contradict this fact as the juvenile records of B.J. are sealed. Thus, the fact that Lt. Lopez was given permission to arrest B.J. by JPO Fernandez must be deemed admitted by the Plaintiffs since they offer no proof to negate Lt. Lopez's sworn statement that he was given such permission.

**12.** On September 9, 2010, B.J. had still not been located when Lt. Lopez arrived at Espanola Valley High School (EVHS). A fire alarm went off and the fire department was called.[6] [UMF 42; not disputed on page 7 of the Response and in fact supported by Plaintiffs' Exhibit 8 to their Response "Dispatch Records"]

**13.** When Lt. Lopez arrived at the high school, Lt. Lopez was informed that an anonymous caller had called the High School switchboard and stated that there was a student on campus with a black handgun in his backpack. The dispatch records for September 9, 2010 show that two reports of a firearm at Espanola Valley High School came in, one at 9:45:38 AM and one at 9:58:35 AM.[7] [UMF 43; no evidence presented by Plaintiff that Lt. Lopez was not so informed; and the report of a gun at the school is supported by Plaintiffs' Exhibit 8 to their Response "Dispatch Records"]

**14.** Lt. Lopez began searching the high school when Lt. Lopez was notified by Sgt. Gallegos that he had information as to B.J.'s whereabouts. B.J. was arrested in a side room "waiting area" at Presbyterian Center and placed in handcuffs only (not leg shackles). At no time did B.J. complain that the handcuffs were hurting him. Sgt. Gallegos drove B.J. to the Española

---

[6] Plaintiffs state that the reports of the fire were quickly handled. For purposes of this motion, the Defendants admit that the dispatch reports for September 9, 2010, show that two reports of a fire at EVHS came in within seconds of each other, 9:21:29 AM and 9:21:52 AM, and that the reports are listed as "closed" at 9:47:15 AM and 10:02:40 AM respectively. *See* Plaintiffs' Exhibit 8 to their Response.

[7] Plaintiffs downplay this fact by stating that police often report to EVHS for reports of criminal activity. For purposes of this motion, Defendants admit the dispatch records also show that in the months preceding September 9, 2010, the police responded to the high school for the following possible criminal activities: 8-20-10 two reports of "possession"; 8-25-10 a report of "possession"; 8-27-10 a report of "possession"; 8-30-10 a report of "possession"; 9-1-10 a report of "possession"; 9-3-10 a report of intoxicated persons; 9-3-10 a report of disorderly conduct; 9-7-10 a report of theft; 9-7-10 a report of disorderly conduct; 9-8-10 a report of "possession." *See* Plaintiffs' Exhibit 8 to their Response.

Detention Center. Sgt. Gallegos relied upon Lt. Lopez's statement of probable cause and the criminal complaint in arresting B.J. [UMFs 44-52 admitted on page 7 of the Response]

## II. ADDITIONAL FACTS

Defendants will accept as true, for purposes of this motion, all additional and/or altered facts alleged by Plaintiffs, such as:

**15.** Lt. Lopez did not contact or interview the student mentioned in the email from Ms. Litera to Ms. Champion.

**16.** On page one (1) of Lt. Lopez's police report, he states that Ms. Litera had brought the "list" to the attention of Ruben Salazar the week before the email was sent.

**17.** B.J. created the "list for hell" at the prompting of his mother for submission to the principal in an attempt to stop the bullying. The drawings were storyboards for a movie.

**18.** C.J. told Lt. Lopez that her son B.J. and she would have words sometimes but that their confrontations never got physical. C.J. told Lt. Lopez that she was never afraid of B.J. and that had she been afraid of B.J. she would have called the police.[8]

**19.** Prior to B.J.'s arrest, B.J. was interviewed by a school psychologist, interviewed by law enforcement, and received a full psychiatric evaluation for homicidal and suicidal ideation and was released from St. Vincent Hospital.

**20.** B.J. created his list and drawings at home and carried them to school in his backpack.

**21.** B.J. never threatened the girl identified as S.M. in the March 2, 2010 handwritten note given to Lt. Lopez by Ms. Ortega.

---

[8] C.J. testifies to these facts on page 3 of her affidavit attached as Exhibit 5 to Plaintiffs' Response. On page 6 of this affidavit, C.J. states at ¶18, "Defendants also state that when they inquired as to if there were any guns in my house, I responded by turning around and running into my home. This is a false allegation." However, Defendants have never asserted such a scenario took place. Instead, this was the fact pattern from case law cited by Defendants (*Ryburn v. Huff,* 132 S.Ct. 987, 181 L.Ed.2d 966 (2012) (*per curiam*)).

**22.** At some point after B.J. was released from the hospital and before he was arrested, "police" came to his house and asked how he was doing. B.J. replied "good."

**23.** B.J. was in the care and custody of his mother at the time of his arrest.

### III.    LT. LOPEZ HAD ARGUABLE PROBABLE CAUSE TO ARREST B.J.

"Arguable probable cause exists when an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed." *Durruthy v. Pastor*, 351 F.3d 1080, 1089 (11th Cir. 2003) (internal quotations and citations omitted). Recently, the Tenth Circuit Court of Appeals stated:

> [W]e are holding that where a question of ultimate fact (in this case, whether a reasonable officer would be unreasonable in concluding that [a] statement …was a true threat under clearly established federal law) cannot be resolved as a matter of law, the law is not clearly established and qualified immunity is appropriate.

*Nielander v. Bd. of County Comm'rs*, 582 F.3d 1155, 1169 (10th Cir. 2009) (emphasis added).[9]

Thus, only if this Court were to find as a matter of law that the Defendants' actions were unreasonable under clearly established law can they be denied qualified immunity. If the Defendants actions are found to be either reasonable under clearly established law, or if the

---

[9] In the *Nielander* case, law enforcement officers were told by county officials, that when Mr. Nielander came to pay his landfill bill, he stated that the next time he went to a Commissioner's meeting he would bring a gun and if the government tried to collect his taxes there would be another Ruby Ridge. *Id.* at 1167. Charges were brought against Mr. Nielander for felony criminal threat. *Id.* at 1162. Mr. Nielander gave a slightly different version of what he said. *Id.* at 1167. The charges were dropped after a preliminary hearing finding of no probable cause. *Id.* at 1163. Mr. Nielander then sued the County for malicious prosecution, First Amendment retaliation, and conspiracy. *Id.* The Tenth Circuit Court of Appeals stated, "we must determine whether a reasonable officer could conclude that Mr. Nielander's statements were true threats before determining if there was a constitutional violation." *Id.* at 1166. The Tenth Circuit Court of Appeals could not "as a matter of law" determine whether it was reasonable or unreasonable for the officers to find that there was a "true threat." *Id.* at 1169. ("Because it is debatable whether a reasonable officer would consider this to be a true threat, an issue of ultimate fact, we cannot say that the applicable law is clearly established such that Deputy Perez acted unreasonably in writing a probable cause determination.") Thus, the Court found the officers were entitled to qualified immunity. *Id.*

reasonableness of the Defendants' actions cannot be resolved as a matter of law, the Defendants are entitled to qualified immunity.

Plaintiffs have admitted the majority of the facts set forth in the Defendants' detailed timeline of events during the forty-six (46) hour period preceding B.J.'s arrest. The facts that Plaintiffs deny are either "denied as immaterial" or are general denials. Other than the affidavit of C.J. stating that she never told Lt. Lopez that B.J. hurt her or that she was afraid of B.J. (and Defendants will adopt Plaintiffs' version of these facts for purposes of this motion), Plaintiffs have failed to offer any counter-evidence to show that a genuine issue of material fact exists. In the face of Defendants' affidavit submissions, counter-evidence on the part of Plaintiffs is required in order to establish a genuine issue of material fact. It is not enough to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## A.  B.J.'s notebook is not protected by the First Amendment

Plaintiffs contend that B.J.'s list and drawings cannot be considered an "unlawful act" under the state criminal statutes because the list and drawings are protected by the First Amendment. In making this argument, the Plaintiffs rely on a "true threat" analysis which is inapplicable to student speech. Plaintiffs' claim, that B.J.'s notebook is not student speech because he did not willingly show it to a third person on school grounds, is meritless.[10] Furthermore, the Plaintiffs lose sight of the fact that the issue is not whether B.J.'s notebook was

---

[10] Plaintiffs attempt to distinguish a case cited by Defendants, *Ryburn v. Huff,* 132 S.Ct. 987, 181 L.Ed.2d 966 (2012) (*per curiam*), arguing that the student-author in *Ryburn* made an effort to publish his private thoughts whereas B.J. did not. However, there are no facts cited in *Ryburn* to suggest that the student-author "made an effort to publish his private thoughts." Indeed, the alleged letter threatening to shoot up the school was simply a rumor and it appear as if no such letter was ever found by the police or school administrators." *Id.* at 988 (student-author "was rumored to have written a letter threatening to 'shoot up' the school").

protected by the First Amendment, but whether Lt. Lopez could have reasonably believed the notebook was not protected by the First Amendment.

> ### *1. B.J.'s notebook is student speech because, by bringing it to campus and opening it on his desk in a classroom, it was reasonably foreseeable that B.J.'s notebook would come to the attention of school authorities*

Pursuant to the United States Supreme Court's decision in *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 513 (1969), "conduct by [a] student, <u>in class or out of it</u>, which for any reason...materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of free speech." (emphasis added) If it is reasonably foreseeable that the student- author's off-campus "speech" would come to the attention of school authorities, the speech is subject to the *Tinker* "material or substantial disruption standard." *See Bell v. Itawamba County Sch. Bd.*, 859 F.Supp.2d 834, 838 (N.D. Miss. 2012). In *Bell*, the student-author composed, sang and recorded a rap song, off-campus, criticizing two coaches at his school with the lyrics "going to get a pistol down your mouth." *Id.* at 836. The court found that, even though the song was not created on school property nor played at the school by the student-author, it was reasonably foreseeable that the song would come to the attention of school officials and was therefore student speech under *Tinker*. *Id.* at 840.

In the case at hand, B.J. admitted he brought his "list for hell" and the drawings to school. [UMFs 1-11 admitted on page 4 of Response] Plaintiffs also do not dispute that Lt. Lopez was informed that B.J. had the notebook open on a desk in a classroom in sight of a student named in the "list for hell." [UMF 20; no evidence presented by Plaintiffs to contradict this was what was told to Lt. Lopez] In fact, Lt. Lopez was informed that it was this student, who saw her name on the " list for hell," who then informed the teacher she feared B.J. would harm her. [UMF 20; no evidence presented by Plaintiffs to contradict this was what was told to Lt. Lopez]

It is irrelevant whether B.J. intended to disseminate the offensive writing or pictures. *See Boim v. Fulton County Sch. Dist.*, 494 F.3d 978, 983 (11th Cir. 2007). In *Boim*, the student-author brought a notebook to school in which she described killing a teacher. *Id.* at 980. She showed the notebook to a fellow student but did not show the teacher. *Id.* The court stated:

> Just as there is no First Amendment right to falsely yell "fire" in a crowded theater, ...there also in no First Amendment right allowing a student to knowingly make comments, whether oral or written, that reasonably could be perceived as a threat of school violence, whether general or specific, while on school property during the school day.\*\*\*Literary merit and technique notwithstanding, without doubt, Rachel's first-person narrative could reasonably be construed as a threat of physical violence against her sixth-period math teacher. That Rachel does not appear to have purposely disseminated the narrative is immaterial in this context. By taking the narrative to school and failing to exercise strict control over the notebook in which it was written, Rachel increased the likelihood to the point of certainty that the narrative would be seen by others, whether by other students or a teacher.\*\*\*Thus, the defendants aptly demonstrated "that [their] action was caused by something more than mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."

*Id.* at 984-985, *quoting Tinker*, 393 U.S. at 509.

Here, it undisputed that Lt. Lopez was told B.J. took his notebook to school and at one point had it open on his desk in a classroom. [UMF 20; no evidence presented by Plaintiffs to contradict this was what was told to Lt. Lopez] By taking the notebook to school and taking it out his backpack in view of fellow students, B.J. increased the likelihood that the notebook would be seen and cause strife among the faculty and students at the school. Clearly, B.J.'s notebook is student speech. At the very least, it was reasonable for Lt. Lopez to treat the notebook as student speech.

### 2. Student Speech is not protected under the First Amendment if there is a showing that the speech materially and substantially interfered with the operation of the school.

Student speech is analyzed under a "risk of substantial disturbance" standard as set forth in *Tinker, supra.* <u>Communication of the threat is not a prerequisite</u> to suppression on *Tinker*

grounds which requires only a showing that the threat created a "risk of substantial disturbance" at the school. *See Tinker,* 393 U.S. at 509. .

   a. Student speech about violence against fellow students *per se* creates a risk of producing a substantial disturbance on school grounds.

Like speech about drug-use, speech about violence against fellow students is not even entitled to an analysis of the "risk of substantial disturbance" set forth in *Tinker*. Similar to drug-use, school administrators need not evaluate the potential for disruption caused by speech about violence against fellow students; "it is *per se* unprotected because of the scope of the harm it potentially foments." *See Ponce v. Socorro Indep. Sch. Dist.,* 508 F.3d 765, 769 (5th Cir. 2007). The student speech at issue in *Ponce* was a notebook diary describing violence against fellow students. *Id.* at 766. The student-author shared his notebook with another student who in turn told a teacher about the notebook. *Id.* When called into the office, the student-author claimed the diary was a work of fiction. *Id.* His backpack was searched and the notebook was taken. *Id.* The police arrested the student-author the next day but the County Attorney's Office declined to prosecute. *Id.* at 767. The student-author was not suing the police for unlawful arrest but instead sued the school district for his suspension from school claiming the school was punishing him for his protected speech. *Id.*

The *Ponce* court found that the diary describing violence against fellow students deserved no First Amendment protection, relying on the United States Supreme Court opinion *Morse v. Frederick,* 551 U.S. 393 (2007). *Ponce,* 508 F.3d at 771-772. In *Morse*, the United States Supreme Court ruled that, in the case of student speech promoting drug-use, no analysis need be done regarding a "risk of substantial disturbance" since speech advocating drug use is *per se* unprotected because of the scope of the harm it potentially incites. *Morse,* 551 U.S. at 408-409. In addition to the *Ponce* court, the Eleventh Circuit Court of Appeals similarly stated in *Boim,*

*supra* that the rationale applied to the drug-use speech in *Morse*, "applies equally, if not more strongly, to speech reasonably construed as a threat of school violence." *Boim*, 494 F.3d at 984.

In finding that student speech advocating violence against fellow students is unprotected under the First Amendment, the *Ponce* Court stated:

> The constitutional concerns of this case—focusing on content—fall precisely within the student speech area demarcated by Justice Alito in *Morse*. That area consists of speech pertaining to grave harms arising from the particular character of the school setting.***As the concurring opinion points out, school attendance results in the creation of an essentially captive group of persons protected only by the limited personnel of the school itself. This environment makes it possible for a single armed student to cause massive harm to his or her fellow students with little restraint and perhaps even less forewarning. Indeed, the difficulty of identifying warning signs in the various instances of school shootings across the country is intrinsic to the harm itself. After Columbine, Thurston, Santee and other school shootings, questions have been asked how teachers or administrators could have missed telltale "warning signs," why something was not done earlier and what should be done to prevent such tragedies from happening again. We therefore find it untenable in the wake of Columbine and Jonesboro that any reasonable school official who came into possession of [the diary] would not have taken some action based on its violent and disturbing content. Our recent history demonstrates that threats of an attack on a school and its students <u>must</u> be taken seriously.

*Id.* at 770-771 (emphasis in the original; internal quotations and citations omitted).

> b. <u>Even performing a Tinker analysis, B.J.'s notebook is not entitled to First Amendment protection.</u>

Even under the *Tinker* standard, B.J.'s notebook was not entitled to First Amendment protection. The undisputed information given to Lt. Lopez is that B.J. took the notebook to school, took it out of his backpack in a classroom, where the "list for hell" was seen by at least one fellow classmate. [UMF 20; no evidence presented by Plaintiffs to contradict this was what was told to Lt. Lopez] B.J. could have labeled his list "kids who bully me," and he would not have created fear in the student who saw it. Under the First Amendment, he is not entitled to take out a piece of paper at school entitled "List for Hell" with the names of fellow students if there is a likelihood that it will be seen by the students or the staff. Here, it was not just likely a fellow student would see it, a fellow student did see it. Furthermore, it was not just likely that it

would materially disrupts classwork or invoke substantial disorder or invasion of the rights of others, it did. [UMFs 26-27; no evidence presented by Plaintiffs to contradict these portions of the affidavits signed by school personnel and Lt. Lopez]

At the very least, whether B.J.'s notebook was entitled to First Amendment protection is not clearly established. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *United States v. Lanier*, 520 U.S. 259, 270 (1997). Given the recent developments in federal law regarding writings and images of violence against fellow students found on school grounds, whether such writings and images are entitled to First Amendment protection is not clearly established.

## B. There was arguable probable cause to arrest B.J. for Assault and/or Aggravated Assault

In their Response, Plaintiffs argue that there was no arguable probable cause to arrest B.J. for either assault or aggravated assault because "there was no evidence that B.J. committed an act which would cause a reasonable person to believe that they were in danger of receiving an immediate battery." Yet, the admitted facts illustrate that the drawings and list that B.J. had out on a desk in a classroom, in view of one of the students on the "list for hell," indeed placed several students and staff in fear of an immediate battery. [UMFs 26-27] *see also* Albuquerque Journal article dated September 15, 2010, attached hereto as Exhibit A. The staff at Espanola Valley High School (EVHS) informed Lt. Lopez that they were fearful that B.J. would come back to the school and act out what he had written and drawn, a fear that was intensified when the school and the police officers learned that B.J. was no longer in the custody of the St. Vincent's hospital. [UMFs 26-27; no evidence presented by Plaintiffs to contradict these portions of the affidavits signed by school personnel and Lt. Lopez]

**C. There was arguable probable cause to arrest B.J. for Harassment**

While Plaintiffs appear to concede that the drawings and list could reasonably be interpreted by Lt. Lopez as "intended to annoy, seriously alarm or terrorize another person," as that term is used in the Harassment statute, Plaintiffs argue that the drawings and list are protected by the First Amendment as there was no communication of the "threat" to a third person. However, as demonstrated above, the First Amendment does not protect B.J.'s list and drawings. Furthermore, the list <u>was communicated</u> in that it was brought to school by B.J. and opened in full view of fellow students.

**D. There was arguable probable cause to arrest B.J. for Stalking**

Plaintiffs argue that Lt. Lopez did not have arguable probable cause to arrest B.J. for stalking because B.J. never "willingly communicated" the list and documents in question to any person. Yet, as set forth in detail above, the list was communicated because it was taken to school by B.J., where he took the list out of his backpack and opened it in front of one of the students named in the list.

**E. There was arguable probable cause to arrest B.J. for Public Nuisance and/or Interference with the Educational Process**

Plaintiffs argue that there was no arguable probable cause to arrest B.J. for Interference with the Educational Process, but Plaintiffs failed to address the Public Nuisance crime.[11] Plaintiffs argue that B.J. could not be arrested for Interference with the Educational Process because he never willingly communicated his drawings and lists to a third party. Yet, Lt. Lopez was informed by school officials of the chaos and fear created by B.J. bringing his drawings and list to school, and by opening the notebook in front of other students The perceived threats of B.J., as observed first hand by Lt. Lopez, certainly created fear among a number of citizens, were

---

[11] If a party does not respond in opposition to a motion, said failure to respond constitutes consent to grant the motion. Local Rule 7.1(a)

injurious to public welfare, and interfered with the students and staff's enjoyment of their right to use school property.

### F. There was arguable probable cause to arrest B.J. for Attempt to Commit a Felony

Finally, as illustrated above, it reasonable for a police officer to treat B.J.'s actions as an attempt to assault fellow students with intent to commit murder. B.J. prepared at home, and displayed at school on his desk, a "list for hell" that contained fellow students' names.

### IV.  DEFENDANTS HAD THE RIGHT TO TAKE B.J. INTO CUSTODY UNDER THE COMMUNITY CARETAKING EXCEPTION

Plaintiffs fail to address the Defendants' argument concerning the community caretaking exception to the requirement of arguable probable cause; thus, it can be deemed that Plaintiffs have consented to the granting of the motion for summary judgment on the community caretaking exception grounds.[12] The community caretaking exception applies where an officer is acting to help those in danger and requires only a reasonable belief that an emergency exists requiring his or her attention. *See United States v. Quezada,* 448 F.3d 1005, 1007 (8th Cir. 2006). The protective seizure of children does not violate the Fourth Amendment if there are exigent circumstances. *Riehm v. Engelking,* 538 F.3d 952, 965 (8th Cir. 2008). "Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution." *Id.* at 966, *quoting Saucier v. Katz,* 533 U.S. 194. 206 (2001).

Plaintiffs appear to argue that because B.J. was in the custody of his mother, he was not a threat to himself or others. A similar argument was made and rejected in *Riehm, supra,* where the custodial parent was ineffective. *Riehm,* 538 F.3d at 966. The student-author in *Riehm* wrote

---

[12] If a party does not respond in opposition to a motion, said failure to respond constitutes consent to grant the motion. Local Rule 7.1(a)

increasingly alarming essays depicting disturbing violence. *Id.* at 958-959. The third essay that concerned school administrators seemed to be a "veiled threat" towards a teacher. *Id.* The court in *Riehm* stated it was reasonable for a social worker to conclude that the mother was an ineffective custodian because discussions with the mother regarding the two previous disturbing essays were "ineffective." *Id.* at 966.

Here, Lt. Lopez heard the school psychologist's concerns regarding C.J.'s (the mother's) regressive behavior towards her son, behavior C.J. does not dispute exhibiting (Dr. Vigil observed C.J. with her head in her son's lap, she was very distraught and B.J. was trying to comfort his mother. C.J. also appeared very distressed at the thought that B.J. may be taken from her for psychiatric care and stated something to the effect that she "needs" B.J. with her). [UMF 21; not disputed by Plaintiffs that this occurred] C.J. also admits to not answering the door when Sgt. Gallegos went to her home on September 8, 2010 even though she knew police were at her door. *See* C.J.'s Affidavit attached as Exhibit 5 to Plaintiffs' Response.

Plaintiffs argue that B.J. could not pose a threat to anyone because he received a full psychiatric evaluation for homicidal and suicidal ideation and was released from St. Vincent Hospital. Again, a similar argument was made and rejected by a federal court. In *Mora v. City of Gaithersburg*, 519 F.3d 216, 219 (4th Cir. 2008), the court was presented with "the question of what emergency preventive action police may take, consistent with the Fourth and Fourteenth Amendments, when they learn of an individual who may well intend a similar [to Columbine] slaughter, but who has neither committed nor attempted any crime." In *Mora*, a local firefighter (Mora) told a healthcare hotline operator that he was suicidal, had weapons in his apartment, could understand shooting people at work, and said, "I might as well die at work." *Id.* at 220. The operator reported the statements to police and officers seized Mora and his weapons. *Id.*

Mora argued that the "public safety rationale" for said seizure was "pretext" because the officers knew he had been released from a hospital by a doctor who determined he was not a danger to himself of others. *Id.* at 228. The court disagreed and stated:

> This argument implies that once police transferred Mora to a psychiatrist, the responsibility for ensuring public safety passed to the psychiatrist as well; the officers could wash their hands of the situation, their job done. But protecting public safety is why police exist***Indeed had they not taken the weapons, and had Mora used those weapons to cause harm, the officers would have been subject to endless second-guessing and doubtless litigation as well, just as the officers and teachers at Columbine were challenged for red flags they had overlooked before that tragedy***Moreover, in the rapidly unfolding series of events, the officers could not be sure of exactly what it was they confronted.***Given these circumstances, to say the emergency vanished when Mora was heading to the hospital is to slice the situation too finely and employ hindsight too readily to action aimed—as we cannot overemphasize—at heading off a human tragedy that, once visited, could not be redeemed or taken back.

*Id.*

It is also notable that B.J. was arrested during school hours. This illustrates that Lt. Lopez was acting in the interests of the safety of the students at the high school. "[I]n this climate of increasing school violence and government oversight,[13] and in light of schools' undisputedly compelling interest in acting quickly to prevent violence on school property, especially during regular school hours, we must conclude that the defendants did not violate [the student's] First Amendment rights. We can only imagine what would have happened if the school officials, after learning of [the student's] writing, did nothing about it and the next day [the student] did in fact come to school with a gun." *Boim*, 494 F.3d at 984 (emphasis added)

Plaintiffs argue there were less intrusive means of protecting the public. However, the "Supreme Court has 'repeatedly stated that reasonableness under the Fourth Amendment does

---

[13] The government oversight to which reference is made by the court is the No Child Left Behind Act of 2001 which requires states receiving federal education funds to allow students who attend a persistently dangerous school or who become victims of violent crime while on school property to attend another school. *Boim*, 494 F.3d at 984.

not require employing the least intrusive means.'" *Riehm*, 538 F.3d at 968, *quoting Bd. Of Educ. of Indep. Sch. Dist. No. 92 v. Earls*, 536 U.S. 822, 837 (2002).

Finally, the arrest of B.J. was approved by two separate law enforcement entities—the Ohkay Owingeh Tribal Court and the Juvenile Probation Office. This undisputed fact lends further credence to the reasonableness of Lt. Lopez's action. "Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Riehm*, 538 F.3d at 962, *quoting Malley v. Briggs*, 475 U.S. 335, 341 (1986). The Defendants are clearly entitled to qualified immunity under the facts of this case.

## V. PLAINTIFFS HAVE ABANDONED THEIR EXCESSIVE FORCE CLAIM

Plaintiffs fail to rebut Defendants' argument that they are entitled to qualified immunity against Plaintiffs excessive force claim. If a party does not respond in opposition to a motion, said failure to respond constitutes consent to grant the motion. Local Rule 7.1(a) Thus, Defendants are entitled to summary judgment in their favor on the Plaintiffs' excessive force claim.

## VI. DEFENDANTS DANNY PACHECO OR RICHARD GALLEGOS ARE ENTITLED TO QUALIFIED IMMUNITY REGARDLESS OF THE DECISION ON LT. LOPEZ

The Plaintiffs have offered no proof that Defendants Danny Pacheco or Richard Gallegos are involved in any meaningful way in the decision to arrest B.J., and this is another reason that Count I must be dismissed against these two Defendants.

**WHEREFORE,** Defendants respectfully request that the Court grant the Defendants summary judgment in their favor on Count I of the complaint pursuant to the doctrine of qualified immunity.

Respectfully Submitted,
***Electronically Filed***
***/S/ Katherine A. Basham***
Katherine A. Basham
Mark A. Basham
Basham & Basham, P.C.
Attorneys for Defendants
2205 Miguel Chavez Rd., #A
Santa Fe, New Mexico 87505
(505) 988-4575; kbasham@bbpcnm.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was mailed to Shannon Kennedy, The Kennedy Law Firm, at 1000 Second Street, NW, Albuquerque, New Mexico, 87102, on this 25th day of April, 2013.

***/S/ Katherine A. Basham***
Katherine A. Basham

CONFIDENTIAL

ABQ
Journal



Drivers who switched
from GEICO to Allstate
saved an average of
$468 a year.

Allstate   QUOTE NOW

LEGAL

**Newsstate**

More Newsstate

Like   Be the first of your friends to like this.

Wednesday, September 15, 2010

## Police: Española Teen With 'Hit List' Arrested, Released

By Vic Vela
*Copyright © 2010 Albuquerque Journal*
*Journal Northern Bureau*

    SANTA FE — A 15-year-old Española Valley High School student was found with a "hit list" of fellow students "who bugged him" and books of his own drawings that depicted gory scenes of death, according to police.

    The teenager was arrested Thursday by Española police and charged with felony crimes of attempted murder and aggravated assault. But the District Attorney's Office dropped the charges, saying police reports did not substantiate them, and he was released.

    Both police and the DA say they believe the boy needs to be treated for mental health issues, but neither knows if that is happening or where he is now.

    Police say he kept a list of 13 students, which he titled a "List for Hell."

    "The top of the list said 'Rest in peace,' " said Lt. Christian Lopez. "At the bottom, he wrote, 'In hell.' "

    Lopez believes the boy, who moved to the area from Georgia about two years ago, had been picked on or bullied at school and that he's suffering from mental health problems. Police confiscated pictures that he drew, including some in which people are being decapitated or set on fire. One rendering was of a smiling boy standing next to a victim who has flames protruding from his body.

    Red crayon was used to illustrate pools of blood in the drawings.

    The day of his arrest, his name came up during a threatening phone call made to the



EXHIBIT

A

TJ and CJ v. Pacheco et. al., 12-CV-565 000195   9/15/2010 1:59 PM

CONFIDENTIAL

school that warned of a "sophomore with a gun" who was on school grounds, according to Lopez. Although he was not in class that day and no immediate threat was substantiated, the phone call caused a temporary lockdown at the high school.

The boy was arrested later that day at a counseling center in Española.

But the Santa Fe District Attorney's Office — after looking over reports from Española police and state Juvenile, Probation and Parole officers — chose not to charge him.

District Attorney Angela "Spence" Pacheco said her office could not uphold the police-recommended charges of attempted murder or aggravated assault because "those crimes were not committed."

"You can't charge someone with something that they may do in the future," Pacheco said. "He did not commit those crimes."

Pacheco said that "strictly from a legal perspective, there was nothing we could charge him with." The DA also said that it would be in "the best interest" for the child to receive mental help.

But Lopez said he felt the evidence supported the charges. "He threatened students," the lieutenant said. "Short of coming out and saying, 'I'm gonna kill you,' he put it down on paper."

"We felt there was more than enough intent," Lopez said. "If something happens, I did my job. And I'd do it again."

**'Scared to death'**

Meanwhile, parents at Española Valley are scared.

The father of a girl whose name was at the top of the hit list said Tuesday that the boy once asked his daughter out but that she rejected his overture. Rodney Benson said his daughter is "scared to death" and that it's not helping matters that the school has not provided families any information as to what's going on.

"I don't think I'm gonna let her go to school," Benson said, "until I find out what's up with this kid."

The police investigation began Sept. 7 — last Tuesday — when a resource officer alerted officers that a student had compiled on a piece of notebook paper a hit list of peers, according to the probable cause statement.

Police interviewed the boy and his mother. During their conversation, the boy said the names were of people "who bugged him."

Not all of the students were identified by name. A few were given derogatory monikers, such as "Pink Whore," "Fat Ass" and "Mexican Hitler."

Some of the pictures were of tombstones with students' names on them.

The police report indicates that "further investigation found that some of the students would pick on ... (the boy) or were bullying him and now he was targeting them through the list."

The boy told police that the pictures "were of a movie he was going to make."

The report says that when he was asked if "he thought he could hurt someone, or any of the persons on the list," he said he didn't know.

When asked if he was going to injure himself, he at first told police, " 'He didn't think so,' but sometimes he didn't know what he was thinking in his head." Asked again later, he said, "Sometimes I think that's the only way out."

Days before his arrest, he allegedly put his hands around his mother's neck after she told him to get ready for school, the woman told police. The mother said that her son had "violent tendencies."

CONFIDENTIAL

After the police interview, the boy was sent by ambulance to Christus St. Vincent Regional Medical Center in Santa Fe for a psychiatric evaluation "because of his possible homicidal and suicidal tendencies." However, Lopez said he doesn't think the boy received any treatment while there. He was released the next day.

The boy's girlfriend told authorities he called from the hospital and asked for a ride home, which she didn't provide. The girl told police that he seemed "distant" during their conversation. It was his mother who ended up taking her son home that day, the report states.

### School threat

The day after his brief stay at the hospital — last Thursday — the high school received a threat of a "sophomore with a gun" on school grounds, Lopez said. His name "came up" after the threatening call, but Lopez said the teen was not on campus at the time.

The school was locked down for a while as police investigated, but classes resumed later in the day. School officials last week would not comment on what led to the shutdown. Calls to Española Public Schools Superintendent Jeanette Archuleta and Assistant Superintendent Fidel Trujillo were not returned Tuesday.

The boy was booked into the Santa Fe County youth jail on Thursday, but was shortly released from detention by Juvenile, Probation and Parole officers, according to jail director Annabelle Romero. District Attorney Pacheco said that was because her office chose to drop the charges against him.

Pacheco said her office came to a decision after meeting with a physician. There was an agreement that the boy's "pressing mental health issue" outweighed him being charged and that the physician would have the boy temporarily committed for mental health services. "You can't have criminal charges pending if you want to get care in a mental facility," she said.

Pacheco said detainees are typically transported from jail to a mental health facility. She doesn't know whether law enforcement did that in this case, and after the charges were dropped she did not know whether the physician followed through. Lopez didn't know Tuesday where the boy was. The Journal was unable to reach a CYFD spokeswoman for comment.

Lopez said he hopes this situation is being taken seriously.

"It's a scary issue to deal with," he said. "Because there's a history of this kind of thing happening. There's going to be people who say, 'This kind of thing doesn't happen in Española,' but I'm sure the people at Columbine (High School in Colorado) thought the same thing."

You also can send comments via our comment form

### Latest Albuquerque and New Mexico News

Roswell Church Says Students Punished for Kindness
Bayard Police Force To Get New Patrol Cars
Roswell Church Says Students Punished for Kindness
Mexican Immigration Official Quits in Wake of Massacre
Farmington Councilors Postpone Discrimination Pact

TJ and CJ v. Pacheco et. al., 12-CV-565