IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

BILLY JONES,

      Plaintiff,

vs.                                  Civ. No. 12-565 KG/SMV

Danny Pacheco, a City of Espanola
Police Officer, and Sergeant Richard
Gallegos, a City of Espanola Police Officer, and
Lieutenant Christian Lopez, a City of Espanola Police Officer,
and City of Espanola, a municipality,

      Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

      This matter comes before the Court upon Defendants' Motion for Summary Judgment on

Count I of Plaintiffs' Complaint Based on Qualified Immunity and Memorandum of Law in

Support (Motion for Summary Judgment), filed November 9, 2012.[1]  (Doc. 27).  On April 8,

2013, Plaintiff filed a response, and on April 25, 2013, Defendants filed a reply.  (Docs. 47 and

52).  Having reviewed the Motion for Summary Judgment, the accompanying briefs, and the

evidence of record, the Court grants the Motion for Summary Judgment, in part, in that summary

judgment is granted in favor of Defendants Danny Pacheco, Richard Gallegos, and Christian

Lopez (collectively, Defendants) on the 42 U.S.C. § 1983 Fourth Amendment excessive force

claim raised in Count I of the Amended Complaint.

---

[1] The Motion for Summary Judgment is premised on the original complaint filed in state court.
*See* (Doc. 1-1).  However, on November 10, 2014, Plaintiff filed an Amended Complaint for
Recovery of Damages Due to Deprivation of Civil Rights, False Imprisonment, and Defamation
(Amended Complaint) which substituted Billy Jones as the named Plaintiff.  (Doc. 68).  Because
the Amended Complaint otherwise remains the same as the original complaint, the Motion for
Summary Judgment is not moot and the Court will rule on the motion.

This case arises from the September 9, 2010, arrest of Plaintiff when he was a minor and high school student.  In Count I of the Amended Complaint, Plaintiff brings Section 1983 claims against Defendants for violating his Fourth Amendment rights.  Plaintiff specifically alleges that Defendants unlawfully arrested him and that Defendant Gallegos used excessive force when he arrested and handcuffed Plaintiff.  In Count II of the Amended Complaint, Plaintiff brings New Mexico Tort Claims Act (NMTCA) claims against Defendants for battery, false imprisonment, and defamation, and a *respondeat superior* claim against Defendant City of Espanola.  Finally, in Count III of the Amended Complaint, Plaintiff brings NMTCA negligence claims against Defendant City of Espanola.  Defendants now move for summary judgment on Count I on the basis of qualified immunity.[2]

A.  *Summary of Undisputed Material Facts Viewed in the Light Most Favorable to Plaintiff*

In the spring semester of 2010, a high school student assaulted Plaintiff on a school bus. (Doc. 48-1) at ¶¶ 1-5.  A student in one of Plaintiff's classes also verbally antagonized Plaintiff. *Id.* at ¶ 9.  As a result of these incidents, Plaintiff's mother instructed Plaintiff to write a list of the people who "bugged" him at school so that Plaintiff and his mother could address this issue with the high school principal.  *Id.* at ¶ 10.  Plaintiff titled the list as a "List for Hell."  *Id.* at ¶ 12. Plaintiff did not intend for this list to be a "hit list."  *Id.*  Instead, Plaintiff intended that the list name people who would go to hell for their bad behavior.  *Id.*

Plaintiff also drew storyboards at home for a horror movie which showed "people killing people…."  *Id.* at ¶ 17.  *See also id.* at ¶¶ 14-16, 18.  Plaintiff carried the storyboards in his

---

[2] Plaintiff asks the Court that he be allowed to depose persons named in Plaintiff's Motion for Limited Discovery Pursuant to Federal Rule 56(d)(2) (Motion for Limited Discovery) and to use the deposition testimony to supplement his response to the Motion for Summary Judgment.  *See* (Doc. 36), (Doc. 47) at 22.  The Court, however, has since denied the Motion for Limited Discovery.  *See* (Docs. 42, 44, and 64).

backpack.  *Id.* at ¶ 18.  At least one of the storyboards depicted headstones with the names of four of Plaintiff's classmates.  (Doc. 27-1) at 9; (Doc. 27-3) at 1, ¶ 8.

On September 7, 2010, an assistant principal at Plaintiff's high school received a copy of an email from Plaintiff's teacher, Josefina Litera, which Ms. Litera had sent to the school counselor earlier that day.  (Doc. 27-3) at 2, ¶ 20.  The email indicated that Ms. Litera saw Plaintiff's hands shaking which Plaintiff explained was caused by missing breakfast.  (Doc. 27-2) at 6.  One of Ms. Litera's female students, however, commented that Plaintiff was "rolling his eyes and making a list and her name was on the list."  *Id.*  Ms. Litera seemed to dismiss the comment by telling the student that she was probably "on the list because she is noisy and laughing."  *Id.*  Nonetheless, Ms. Litera noted that two female students stated that they were afraid of Plaintiff.  *Id.*  Ms. Litera ended the email by requesting that the school counselor "look into [Plaintiff's] record if there is something wrong with his health."  *Id.*

After reviewing Ms. Litera's email on September 7, 2010, the assistant principal called Plaintiff to her office that same day.  (Doc. 27-3) at 2, ¶ 21.  Plaintiff's mother, Defendant Lopez, Defendant Pacheco, a school security officer, and school psychologist Lloyd Vigil met with the assistant principal and Plaintiff.  *Id.* at 1, ¶¶ 2-3.  During the meeting, the assistant principal searched Plaintiff's backpack and found the "List for Hell" and the storyboards.  *Id.* at 1, ¶ 4.  Plaintiff's mother informed Defendant Lopez and the others that Plaintiff was working on drawing movie storyboards at home and did not intend to harm anyone.  (Doc. 48-2) at ¶ 6.  In fact, Plaintiff's therapist told Plaintiff to draw and write "as a way to relive [sic] the stress of being bullied at school."  *Id.* at ¶ 7.  Plaintiff's mother also told Defendant Lopez that the students on Plaintiff's "List for Hell" had verbally and physically threatened Plaintiff.  *Id.* at ¶ 8.  Plaintiff's mother did not indicate that she was afraid of Plaintiff or that he had been violent with

her. *Id.* at ¶ 15.  Plaintiff's mother further noted that Plaintiff had missed breakfast the morning

of September 7, 2010, and that was why Plaintiff's hands were shaking.  *Id.* at ¶ 10.

Defendant Lopez asked Plaintiff "if he was going to hurt or injure himself and he replied

'I don't think so' but that sometimes he didn't know what he was thinking in his head."  (Doc.

27-1) at 2, ¶ 12.  Defendant Lopez then asked Plaintiff "if he thought he could hurt someone, or

any of the fellow students on the list and [Plaintiff] stated that he did not know."  *Id.* at 2, ¶ 14.

Defendant Lopez further asked Plaintiff "if he would hurt himself such as kill himself, and

[Plaintiff] stated 'I don't know sometimes I think that's the only way out.'"  *Id.* at 3, ¶ 15.

At one point during the meeting, Mr. Vigil stepped out of the office to speak with

Defendant Lopez.  (Doc. 27-3) at 4, ¶ 6.  While outside the office, Mr. Vigil saw Plaintiff's

mother with her head in Plaintiff's lap.  *Id.*  Mr. Vigil also observed that Plaintiff's mother was

distraught about Plaintiff possibly being taken from her for psychiatric care.  *Id.* at 4, ¶ 7.  Mr.

Vigil told Defendant Lopez what he saw.  *Id.* at 4, ¶ 8.

After the meeting, Plaintiff was transported from the high school, by ambulance, to St.

Vincent's Hospital for a psychiatric evaluation.  *Id.* at 2, ¶ 22.  Before Defendant Lopez left the

school, the assistant principal gave Defendant Lopez a copy of a March 2, 2010, note written by

Samantha Madrid, a student.  *Id.* at 2, ¶ 19.  Samantha Madrid wrote:

> Billy Jones is threating [sic] me by telling me that hes [sic] going to kill me and that I
> was on his hit list and that he was going to bring a knife or Gun and kill me And [sic] Im
> [sic] afraid to come to School.  I want him to stop and leave me alone because he will be
> responsible if he hurts me.

(Doc. 27-2) at 5.  Plaintiff, however, denies that he ever threatened Samantha Madrid and

Defendant Lopez did not ask Plaintiff about this note at any time.  (Doc. 48-1) at 3, ¶ 22.  The

assistant principal also gave Defendant Lopez a copy of Ms. Litera's email.  (Doc. 27-3) at 2, ¶

20.

4

The next day, September 8, 2010, another assistant principal at Plaintiff's high school informed Defendant Lopez that his daughter, who was dating Plaintiff, received phone calls from Plaintiff the night before asking that she come get him from the hospital.  (Doc. 27-1) at 3-4, ¶¶ 22 and 24.  Defendant Lopez spoke with the daughter who described Plaintiff as sounding "distant."  *Id.* at 4, ¶ 23.  At that point, Defendant Lopez became concerned that Plaintiff was attempting to leave the hospital without permission.  *Id.* at 4, ¶ 25.

Yet another assistant principal contacted Defendant Lopez that day to express that administrators at the school feared that Plaintiff "would come to the school and act out what he had written and drawn."  *Id.* at 4, ¶ 27.  Defendant Lopez consequently prepared a Criminal Complaint and Statement of Probable Cause to arrest Plaintiff for attempt to commit murder and aggravated assault.  (Doc. 27-2) at 7-11.  Defendant Lopez noted in his Statement of Probable Cause that Plaintiff's mother had picked Plaintiff up from the hospital and that he was in her custody.  *Id.* at 11.  In fact, Plaintiff was discharged to his mother's care because he was not a threat to himself or others.  (Doc. 48-2) at 4, ¶ 17.

That same day, Defendant Lopez received permission from a Juvenile Probation Officer to arrest Plaintiff so he could receive a court ordered psychiatric evaluation.  (Doc. 27-1) at 4, ¶ 30.  Defendant Lopez then asked Defendant Gallegos to obtain permission from the Ohkay Owingeh tribal court to go to Plaintiff's residence on the Ohkay Owingeh Pueblo to arrest Plaintiff.  *Id.* at 5, ¶ 31.  The Ohkay Owingeh tribal court granted Defendant Gallegos' request. (Doc. 27-3) at 9.

When officers arrived at Plaintiff's home, they asked how Plaintiff was doing.  (Doc. 48-2) at 4, ¶ 18.  Plaintiff replied that he was "fine" and the officers determined that Plaintiff did not have access to any guns or weapons.  *Id.* at 4, ¶ 18.  The officers then left the residence.  *Id.* at 4,

¶ 18.  Several hours later, the officers returned to Plaintiff's house.  *Id.* at 4, ¶ 19.  Plaintiff and his mother did not answer the door because they were afraid the officers would arrest Plaintiff. *Id.* at 4, ¶ 19.

Plaintiff did not attend school the next day, on September 9, 2010.  *Id.* at 5, ¶ 21.  That day a fire alarm was pulled at the high school, and shortly thereafter, an anonymous individual called the high school stating "that there was a student on campus with a black handgun in his backpack."  *Id.* at 13, ¶¶ 11-12.  Defendant Lopez responded to the incidents at the school by instigating a search of the school.  (Doc. 27-1) at 5, ¶ 34.  As Defendant Lopez began the search, Defendant Gallegos informed Defendant Lopez that he located Plaintiff.  *Id.* at 5, ¶ 34. Defendant Lopez then instructed Defendant Gallegos to arrest Plaintiff, which Defendant Gallegos did while Plaintiff was waiting for a counseling appointment at a medical center.  *Id.* at 5, ¶ 35; (Doc. 48-1) at 4, ¶ 29.  Plaintiff did not complain to Defendant Gallegos that the handcuffs were painful.  (Doc. 27-3) at 7, ¶ 11.

### B. Standard of Review

Summary judgment is appropriate if there is no genuine dispute as to a material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).[3]  When a defendant moves for summary judgment on the basis of a qualified immunity defense, the Court "still view[s] the facts in the light most favorable to the non-moving party and resolve[s] all factual disputes and reasonable inferences in its favor."  *Estate of Booker v. Gomez*, 745 F.3d 405, 411(10th Cir. 2014).  Unlike other affirmative defenses, the plaintiff bears the burden of overcoming the defense of qualified immunity.  *Id.*  At the summary judgment stage, the Court

---

[3]Rule 56 was amended effective December 1, 2010, but the standard for granting summary judgment remains unchanged.

"must grant qualified immunity unless the plaintiff can show (1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Id.*

C. *Discussion*

    1. *The Fourth Amendment Unlawful Arrest Claim*

    Defendants argue that they are entitled to qualified immunity with respect to the Fourth Amendment unlawful arrest claim because they had probable cause to arrest Plaintiff for various state crimes including assault, aggravated assault, harassment, stalking, public nuisance, interference with the educational process, and attempt to commit murder.  Defendants further argue that they were entitled to take Plaintiff into custody under their community caretaking function.  Finally, Defendants argue for the first time in their reply that Defendants Pacheco and Gallegos are entitled to qualified immunity on the unlawful arrest claim because they were not involved in Defendant Lopez's decision to arrest Plaintiff.

    Plaintiff contends that Defendants did not have probable cause to arrest him on the basis of his "List for Hell" and drawings because the First Amendment protects that speech.  Plaintiff also contends that Defendants, nonetheless, did not have probable cause to arrest him for assault, aggravated assault, harassment, stalking, interference with the educational process, and attempt to commit murder.  Although Plaintiff fails to address the public nuisance probable cause issue as well as the community caretaking issue, the Court will analyze those issues rather than find that Plaintiff, by his silence, implicitly concedes that Defendants prevail on those issues.  *See Reed v. Bennett*, 312 F.3d 1190, 1195 (10th Cir. 2002) ("a party's failure to file a response to a summary judgment motion is not, by itself, a sufficient basis on which to enter judgment against the party.").

### a. *Probable Cause to Arrest Plaintiff*

In a Section 1983 action based on a warrantless arrest, an officer is "entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest" the plaintiff. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995). This is an objective standard and requires a "substantial probability" that a suspect committed a crime. *Kerns v. Bader*, 663 F.3d 1173, 1188 (10th 2011); *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004). The Court further notes that "the probable cause inquiry is not restricted to a particular offense, but rather requires merely that officers had reason to believe that a crime—any crime—occurred." *United States v. Turner*, 553 F.3d 1337, 1345 (10th Cir. 2009). Moreover, an officer may rely on a fellow officer's personal observations to establish probable cause for an arrest. *Buck,* 549 F.3d. at 1282. This concept is predicated on the officers' collective knowledge. Furthermore, an officer may use hearsay "as a source of probable cause." *United States v. Swingler*, 758 F.2d 477, 487 (10th Cir. 1985). Finally, the Court acknowledges that whether an officer had probable cause to arrest someone is generally a question of fact for the jury. *Buck*, 549 F.3d at 1281.

#### (1)  *First Amendment Free Speech Protections*

The first issue regarding probable cause is whether the First Amendment protects Plaintiff's "List for Hell" and drawings. *See Mink v. Knox*, 613 F.3d 995, 1003-4 (10th Cir. 2010) ("It goes without saying that a government official may not base her probable cause

8

determination on an 'unjustifiable standard,' such as speech protected by the First Amendment."). Courts have adopted two different approaches to determine whether the First Amendment protects a student's speech. Under the first approach, the First Amendment does not protect student speech which is a "true threat." *See, e.g., Porter v. Ascension Parish School Bd.*, 393 F.3d 608, 614-21 (5th Cir. 2004). Under the second approach, the *Tinker* approach, the First Amendment does not protect student speech which officials could reasonably foresee would "materially disrupt[]" the school or "involve[] substantial disorder" at the school. *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506 (1969).

The Tenth Circuit has adopted the *Tinker* approach when generally confronting private student speech. *See Taylor v. Roswell Independent School District*, 713 F.3d 25, 35-36 (10th Cir. 2013) (student distribution of rubber fetuses at school). Because the Tenth Circuit applies *Tinker* generally to private student speech and other Courts have applied *Tinker* to student speech like that in this case, the Court believes that *Tinker* applies to this case as well. *See, e.g., Boim v. Fulton County School District*, 494 F.3d 978, 982-83 (11th Cir. 2007) (applying *Tinker* when student wrote passage in notebook describing shooting teacher). In *Taylor*, the Tenth Circuit described the *Tinker* approach as follows:

> Under *Tinker,* a public school may not restrict private student expression unless the school reasonably forecasts it "would materially and substantially interfere with the requirements of appropriate discipline in operation of the school," or "impinge upon the rights of other students."
>
> A disruption need not actually materialize. School officials may act to prevent problems as long as the situation "might reasonably [lead] authorities to forecast" substantial disruption or interference with the rights of others. This forecast must be reasonable. Officials may not restrict speech based on "undifferentiated fear or apprehension of disturbance" or a "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."
>
> For a school's forecast to be reasonable, courts generally require that it be based on a "concrete threat" of substantial disruption. *Tinker* rejected the idea that a "silent,

passive" expression that merely provokes discussion in the hallway constitutes such a threat, particularly if that expression is political.

*Taylor*, 713 F.3d at 36-37 (citations and footnote omitted).

Although Defendants agree that *Tinker* applies to situations like this one, Defendants cite two cases for the proposition that student speech concerning violence against fellow students creates a *per se* risk of producing a substantial disturbance on school grounds.  The first case Defendants cite is *Ponce v. Socorro Independent School District*, 508 F.3d 765 (5th Cir. 2007). That case, however, is distinguishable from this case because the Fifth Circuit was concerned with the possibility of a mass school shooting and not with "violence aimed at specific persons," which is the case here.  *Id.* at 770-71.  Next, Defendants cite *Boim v. Fulton County School District*, 494 F.3d 978 (11th Cir. 2007).  In reading *Boim* as a whole, the Court finds that the Eleventh Circuit ultimately applied the *Tinker* approach rather than a *per se* approach.  *Id.* at 985 ("Rachel created an appreciable risk of disrupting RHS in a way that, regrettably, is not a matter of mere speculation or paranoia.").  *See also D.J.M. ex rel. D.M. v. Hannibal Public School District No. 60*, 647 F.3d 754, 766 (8th Cir. 2011) ("The Eleventh Circuit also used the *Tinker* standard to decide *Boim v. Fulton County School District,* 494 F.3d 978 (11th Cir. 2007) ….). The Court, therefore, rejects use of a *per se* standard and will apply the *Tinker* approach as described in *Taylor*.

In this case, the evidence before Defendant Lopez indicated that Plaintiff did not show his "List for Hell" and drawings to anyone at the high school nor did he actually threaten anyone with that list and those drawings.  Moreover, there is no evidence that the list the female student in Ms. Litera's class referred to was the "List for Hell" or a "hit list" of some kind.  A reasonable jury could, therefore, conclude that Plaintiff's "List for Hell" and drawings did not constitute a "concrete" threat of a substantial disruption at the high school.  Under these circumstances, a

10

reasonable jury could find that Defendant Lopez could not have reasonably forecast that Plaintiff's "List for Hell" and drawings would materially and substantially interfere with the operation of the high school or with the rights of others.

Even so, Defendant Lopez could have reasonably relied on Plaintiff's "List for Hell" and drawings to come to a lawful probable cause determination.  Although *Tinker* clearly established that Defendants could curtail Plaintiff's speech only if Defendant Lopez could have reasonably forecast that Plaintiff's "List for Hell" and drawings would materially and substantially disrupt the high school's operation or the rights of others, only in 2013, three years after Plaintiff's arrest, did the Tenth Circuit seem to require a concrete threat under a *Tinker* analysis.  *See Taylor*, 713 F.3d at 37.  Prior to Plaintiff's arrest in 2010, a reasonable officer could have relied on a 2007 case, like *Boim*, in which the Eleventh Circuit concluded that the First Amendment did not protect a student's speech when that student created "an appreciable risk of disrupting" her school "[b]y taking [a violent] narrative to school and failing to exercise strict control over the notebook in which it was written" thereby, increasing "the likelihood to the point of certainty that the narrative would be seen by others, whether by other students or a teacher."  *Boim*, 494 F.3d at 985.  A reasonable officer relying on *Boim* could conclude that Plaintiff created an appreciable risk of disrupting his high school by carrying his "List for Hell" and drawings to school in a backpack and, therefore, increasing the likelihood that a student or teacher would see that list and those drawings.  Under these circumstances, a reasonable officer in Defendant Lopez's position would not understand that Plaintiff's arrest was unlawfully premised on a violation of Plaintiff's First Amendment right to free speech.  Consequently, Defendant Lopez's reasonable reliance on the "List for Hell" and the drawings does not, in itself, make Plaintiff's arrest unlawful under the Fourth Amendment.

*(2)  Probable Cause to Arrest under State Criminal Statutes*

In making a general probable cause argument, Defendants cite three cases involving students:  *Ryburn v. Huff*, 132 S.Ct. 987 (2012); *Strawn v. Holohan*, 2008 WL 65586 (N.D. N.Y.); and *D.F. v. Bd. of Educ. of Syosset Central School Dist.*, 386 F.Supp.2d 119 (E.D. N.Y. 2005).   Those cases, however, are distinguishable from this one.  First, *Ryburn* involved a warrantless search of a student's home which did not result in an arrest.  *Ryburn* also did not involve a claim of First Amendment free speech.  Second, in *Strawn*, the student was arrested for falsely reporting an incident, a charge not at issue here.  Moreover, the student in *Strawn* showed fellow students a story on how to accomplish a mass shooting on the school grounds.  Here, Plaintiff did not show his "List for Hell" or his drawings to fellow students.  There is also no evidence that the list Plaintiff made in Ms. Litera's class was threatening to anyone.  In addition, the *Strawn* court did not address any First Amendment free speech claims.  Third, although *D.F.* involved a First Amendment free speech claim, that case involved a school suspension, not an arrest.

Additionally, Defendants provide various news articles concerning student attacks on schools to bolster their general probable cause argument.  Defendants, however, do not convince the Court that a general fear of school shootings negates an officer's constitutional obligation to determine probable cause before arresting a student or any individual.

*(a)  Assault and Aggravated Assault*

Defendants argue first that Defendant Lopez had probable cause to arrest Plaintiff for assault and aggravated assault.  Assault consists of a "threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery…."

NMSA 1978, § 30-3-1(B) (Repl. Pamp. 2004).  Under this statute, the victim must "actually, subjectively comprehend[] that he or she was going to receive unwelcome physical contact." *State v. Arrendondo*, 2012-NMSC-013 ¶15, 278 P.3d 517.  Moreover, a prosecutor must show that "a *reasonable person* in the victim's circumstance also *would believe*, that he or she was about to be assaulted…." *Id.* at ¶ 14.  An aggravated assault consists of "willfully and intentionally assaulting another with intent to commit any felony."  NMSA 1978, § 30-3-2(C) (Repl. Pamp.2004).  Assault is, therefore, required before an aggravated assault can occur.

A reasonable jury could find that on September 7, 2010, a reasonable officer would have identified the following potential victims of assault and aggravated assault:  Samantha Madrid, the female students in Ms. Litera's class, and the students named in Plaintiff's "List for Hell" and in his drawings.  A reasonable jury could not find that Samantha Madrid's note, dated approximately six months before Defendant Lopez encountered Plaintiff, would provide sufficient evidence that Samantha Madrid actually comprehended she was in danger of receiving an immediate battery or that a reasonable person in Samantha Madrid's circumstance would believe that she was in danger of receiving "an immediate battery."  Moreover, Defendant Lopez did not have any evidence that the list described in Ms. Litera's email was threatening.  Ms. Litera's email states only that a female student commented that Plaintiff was "making a list and her name was on the list." (Doc. 27-2) at 6.  A reasonable jury, therefore, could not find that the female student actually comprehended she was in danger of receiving an immediate battery or that a reasonable person in her circumstance would believe she was in danger of receiving an immediate battery.  Additionally, Defendant Lopez did not have any information regarding exactly what the two female students in Ms. Litera's class were afraid of.  Consequently, a reasonable jury could not find that the two female students actually comprehended that they were

in danger of receiving an immediate battery or that reasonable persons in the shoes of the two female students would believe that they were in danger of receiving an immediate battery. Finally, Defendant Lopez did not have any evidence that the students listed in Plaintiff's "List for Hell" and drawings even were aware that Plaintiff had made that list and those drawings. Accordingly, a reasonable jury could not find that those particular students could have actually comprehended that Plaintiff would batter them in the immediate future, let alone that reasonable persons in the circumstances of those students would believe that Plaintiff was threatening to batter them immediately.  In sum, a reasonable jury could find that a reasonable officer would not have believed that he had probable cause to arrest Plaintiff for assault or aggravated assault.

*(b)  Harassment*

Next, Defendants contend that Defendant Lopez had probable cause to arrest Plaintiff for harassment.  "Harassment consists of knowingly pursuing a pattern of conduct that is intended to annoy, seriously alarm or terrorize another person and that serves no lawful purpose.  The conduct must be such that it would cause a reasonable person to suffer substantial emotional distress."  1978 NMSA, § 30-3A-2(A) (Repl. Pamp. 2004).  A reasonable jury could not find that the description of a threat in Samantha Madrid's note constitutes a harassing "pattern of conduct" against her.  The same analysis applies to the female student in Ms. Litera's class who complained only once that Plaintiff wrote her name on a list.  A reasonable jury also could not find that the list described in Ms. Litera's email would cause a reasonable person to suffer substantial emotional distress.  Furthermore, a reasonable jury could not find that Defendant Lopez had evidence before him to suggest that Plaintiff knowingly pursued a pattern of conduct to scare the two female students in Ms. Litera's class or that Plaintiff's conduct toward those female students would cause a reasonable person in their circumstances to "suffer substantial

14

emotional distress." Next, a reasonable jury could not find that Plaintiff intended to terrorize the students named in the "List for Hell" and described in his drawings when he did not show the "List for Hell" or drawings to those students. Likewise, a reasonable jury could not find that the "List for Hell" and drawings would cause a reasonable person in the circumstances of the students implicated in the "List for Hell" and the drawings to suffer substantial emotional distress when the students did not see that list and those drawings. Hence, a reasonable jury could find that a reasonable officer would not have believed that he had probable cause to arrest Plaintiff on the basis of harassment.

*(c)  Stalking*

Defendants also assert that Defendant Lopez had probable cause to arrest Plaintiff for stalking. "Stalking consists of knowingly pursing a pattern of conduct, without lawful authority, directed at a specific individual when the person intends that the pattern of conduct would place the individual in reasonable apprehension of death [or] bodily harm…." 1978 NMSA, § 30-3A-3(A) (Cum. Supp. 2012). A "pattern of conduct" is defined under this law as "two or more acts, on more than one occasion, in which the alleged stalker" threatens a person or communicates to a person. *Id*. at § 30-3A-3(B)(2). As with the harassment allegation, a reasonable jury could not find that Plaintiff's behavior towards Samantha Madrid and the female students in Ms. Litera's class consisted of a pattern of conduct directed toward each of those specific students. Moreover, a reasonable jury could not find that the situation in Ms. Litera's class would place the female students in reasonable apprehension of death or harm. A reasonable jury could also not find that Plaintiff's "List for Hell" and drawings, while directed at specific students, placed those students "in reasonable apprehension of death [or] bodily harm" when they never saw the "List for Hell" and the drawings. Moreover, a reasonable jury could not find that the "List for Hell"

and drawings constituted a pattern of conduct because Plaintiff did not use the "List for Hell" and the drawings to threaten or somehow communicate with the targeted students. Accordingly, a reasonable jury could find that a reasonable officer would not have believed that he had probable cause to arrest Plaintiff for stalking.

### (d) Public Nuisance

Defendants further contend that Defendant Lopez had probable cause to arrest Plaintiff for public nuisance. "A public nuisance consists of knowingly creating … or maintaining anything affecting any number of citizens without lawful authority which is either: (A) injurious to public health, safety, morals or welfare; or (B) interferes with the exercise and enjoyment of public rights, including the right to use public property." 1978 NMSA, § 30-9-1 (Repl. Pamp. 2004). In New Mexico "'[a] public nuisance must affect a considerable number of people or an entire community or neighborhood.'" *Harapat v. Vigil*, 676 F. Supp. 2d 1250, 1267 (D.N.M. 2009) (quoting *Environmental Imp. Div. of New Mexico Health and Envt. Dep't v. Bloomfield Irrigation Dist.,* 1989-NMCA-049 ¶ 22, 108 N.M. 691). In this case, Defendant Lopez was aware that Plaintiff actually threatened only one person, Samantha Madrid, not a number of persons. A reasonable jury could find that any injury she may have suffered does not amount to an injury to the public or an interference with public rights. Furthermore, Defendant Lopez subsequently learned that Plaintiff was released from the hospital to his mother's care and officers knew that Plaintiff was fine and did not have access to guns or weapons. Although Plaintiff and his mother failed to answer the door when officers came to their home a second time, a reasonable jury could find that this action was not particularly suspicious considering what occurred during the officers' first visit to the home. A reasonable jury, however, could find that the school administrators' fear which developed after Plaintiff called his girlfriend for a ride

from the hospital in combination with the subsequent activation of the fire alarm at the high

school and the anonymous call to the high school about a student with a gun in a backpack

constituted probable cause to arrest Plaintiff for public nuisance.  Even so, a reasonable officer's

concerns about Plaintiff creating a public nuisance would have been dispelled when he later

located Plaintiff in his counselor's waiting room.  Consequently, a reasonable jury could find that

a reasonable officer would not have believed that he had probable cause, at that time, for

arresting Plaintiff for public nuisance.

<em>(e) Interference with the Educational Process</em>

In addition, Defendants contend that Defendant Lopez had probable cause to arrest

Plaintiff for interference with the educational process.  Interference with the educational process

occurs when a person "willfully interfere[s] with the educational process of any public or private

school by … threatening to commit … any act which would disrupt, impair, interfere with or

obstruct the lawful mission, processes, procedures or functions of a public or private school."

1978 NMSA, § 30-20-13(D) (Repl. Pamp. 2004).  Here, although Samantha Madrid stated that

Plaintiff had threatened to bring a knife or gun, presumably to school, Defendant Lopez did not

see that note until several months after Samantha Madrid wrote it.  It is also significant that

Samantha Madrid did not complain further about Plaintiff.  A reasonable jury, therefore, could

find that when Defendant Lopez saw Samantha Madrid's note on September 7, 2010, the threats

in the note did not constitute a present or concrete threat to disrupt the high school.  Moreover, a

reasonable jury could find that Plaintiff's benign actions in Ms. Litera's class did not amount to a

threat to disrupt the high school.  In addition, because Plaintiff did not show his "List for Hell" or

drawings to anyone, a reasonable jury could find that Plaintiff did not intend for the "List for

Hell" and the drawings to constitute a threat to disrupt the high school.  Finally, a reasonable jury

17

could not find that the school administrators' fear which developed after Plaintiff called his

girlfriend for a ride from the hospital supports a finding that Plaintiff willfully intended to disrupt

the school when Defendant Lopez knew on September 8, 2010, that Plaintiff had been released

to the custody of his mother, and that officers knew that Plaintiff was fine and did not have

access to guns or weapons.  Nonetheless, a reasonable officer could still have concerns about

Plaintiff interfering with the educational process in light of the September 9, 2010, activation of

the fire alarm at the high school and the anonymous call to the high school about a student with a

gun in a backpack.  However, once a reasonable officer learned that Plaintiff was not at school

on September 9, 2010, and was instead waiting to see a counselor, any probable cause to arrest

Plaintiff on the basis of interference with the educational process would have dissipated.  In sum,

a reasonable jury could find that a reasonable officer would not have believed that he had

probable cause to arrest Plaintiff for interference with the educational process.

### (f) Attempt to Commit Murder

Finally, Defendants argue that Defendant Lopez had probable cause to arrest Plaintiff for

attempt to commit murder.  An attempt to commit a felony, like murder, "consist of an overt act

in furtherance of and with intent to commit a felony and tending but failing to effect its

commission."  NMSA 1978, § 30-28-1 (Repl. Pamp. 2004).  Defendants contend that Plaintiff's

"List for Hell" constituted an attempt to assault students with intent to commit murder.  (Doc.

52) at 15.  As discussed above, a reasonable jury could not find that a reasonable officer would

have probable cause to believe that Plaintiff committed assault by making a "List for Hell."

Moreover, a reference to hell does not necessarily mean an intent to kill.  As Plaintiff explained,

he thought those students would end up in hell because of their bad behavior.  A reasonable jury

18

could find that a reasonable officer would not have believed that he had probable cause to arrest Plaintiff for attempted murder.

### (3)  Summary

Although the First Amendment protects Plaintiff's "List for Hell" and drawings as free speech, the state of the law on First Amendment rights for student speech at the time of Plaintiff's arrest was such that Defendant Lopez could have reasonably believed that the First Amendment did not protect the "List for Hell" and the drawings.  Consequently, Defendant Lopez did not violate Plaintiff's Fourth Amendment right to be free from an unlawful seizure by merely relying on the "List for Hell" and the drawings in deciding whether he had probable cause to arrest Plaintiff.  Nevertheless, Defendant Lopez, and the other Defendants who relied on Defendant Lopez's decision to arrest Plaintiff, did not have probable cause to arrest Plaintiff for a myriad of state crimes.  Defendants, therefore, are not entitled to qualified immunity on Plaintiff's claim that they lacked probable cause to arrest him.  Defendants argue, however, that even if they lacked probable cause to arrest Plaintiff, they are still entitled to qualified immunity for Plaintiff's arrest because they engaged in community caretaking when they seized Plaintiff.

### b.  Community Caretaking

The Tenth Circuit has recognized that, as part of his or her community caretaking duties, "a police officer may have occasion to seize a person . . . in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity."  *United States v. King*, 990 F.2d 1552, 1560 (10th Cir. 1993).  Such seizures are subject to the same reasonable suspicion and probable cause requirements as criminal seizures, but instead of suspecting the person of involvement in crime, the officer must suspect that the

19

person is a threat to the safety of the public and/or himself.  *See Anaya v. Crossroads Managed Care Sys., Inc.*, 195 F.3d 584, 591 (10th Cir. 1999) (holding that seizure of intoxicated person for purposes of detoxification is reasonable only if officer has "probable cause to believe [the] intoxicated person is a danger to himself or others."). Moreover, an emergency must exist in order to apply the community caretaker doctrine.  *United States v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006).  Ultimately, "a reviewing court [must] balance the governmental interest in the police officer's exercise of his or her 'community caretaking function' and the individual's interest in being free from arbitrary government interference."  *King*, 990 F.2d at 1560.

        In this case, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that Defendants had the following material information prior to arresting Plaintiff under a purported caretaking function:  (1) on September 7, 2010, Defendant Lopez had information, albeit unsubstantiated, of students being fearful of Plaintiff; (2) Defendant Lopez saw the "List for Hell" and Plaintiff's drawings; (3) Plaintiff indicated to Defendant Lopez that he was unsure if he would harm himself or others; (4)  Plaintiff went to a hospital for a mental evaluation; (5) before being released to his mother's care, Plaintiff, using a "distant" tone, had asked his girlfriend for a ride from the hospital; (6) on September 8, 2014, school administrators communicated to Defendant Lopez that they were fearful of Plaintiff returning to the school to do harm; (7) the Juvenile Probation Officer approved Plaintiff's arrest to conduct a court-ordered psychiatric evaluation; (8) the Ohkay Owingeh tribal court granted Defendant Gallegos permission to go to Plaintiff's home to apprehend him; (9) officers later ascertained that Plaintiff was at home with his mother, feeling fine, and had no access to guns or weapons; (10) no one answered the door at Plaintiff's home when officers came to the home a second time; and (11) on

September 9, 2010, Defendant Lopez was informed of a fire alarm going off at the high school and of an anonymous phone call to the high school regarding a student with a gun in his backpack.   Looking at the totality of these circumstances, an officer could reasonably suspect that Plaintiff might harm himself or others.   Even so, a reasonable jury could find that once Defendant Gallegos located Plaintiff on September 9, 2010, at his counselor's office any reasonable suspicion of harm would have evaporated.

Nevertheless, citing *Mora v. The City of Gaithersburg, Md.,* Defendants contend that Plaintiff's presence at this counselor's office did not prevent Defendants from detaining Plaintiff under their community caretaking function.   *Mora*, 519 F.3d 216, 228 (4th Cir. 2008).   *Mora* is, however, distinguishable from this case.   In that case, the plaintiff made a 911 call in which he told the operator that "he was suicidal, had weapons in his apartment, could understand shooting people at work, and said, 'I might as well die at work.'"   *Id.* at 220.   Within minutes of the call, officers arrived at the plaintiff's apartment where they found the plaintiff loading suitcases and gym bags into a van in the parking lot.   *Id.*   In a matter of a few minutes, the officers learned that the plaintiff had broken up with his girlfriend, and that a co-worker confirmed that officers should take the plaintiff's threats seriously.   *Id.*   The officers then handcuffed the plaintiff while they searched the suitcases, gym bags, and the plaintiff's apartment.   *Id.*   The officers found a handgun in one of the gym bags and various handguns, rifles, ammunition, gun accessories, and survival literature in the apartment.   *Id.*   At that point, officers drove the plaintiff to a hospital for a psychiatric evaluation.   Afterwards, the officers went back to the apartment and seized the weapons, ammunition, and the survival literature.   *Id.*   The plaintiff sued the officers for unlawfully seizing his property.   The Fourth Circuit held that the officers did not relinquish their duty to protect the public by simply "handing Mora over to doctors…."   *Id.* at 228.   Unlike

*Mora,* this case involves an arrest and does not involve the discovery of weapons, or a collaborating witness like the co-worker in *Mora.  Mora* also involved an exigent situation where the plaintiff appeared to be loading guns into a van to possibly either harm himself or others. Here, at the time of Plaintiff's arrest at his counselor's office, no apparent exigent circumstances existed.

In sum, a reasonable jury could determine that, in this case, Plaintiff's interest in avoiding arbitrary governmental interference with his freedom outweighed the government's interest in his detention.  Hence, a reasonable jury could find that the community caretaking function did not justify Plaintiff's arrest.  Defendants are, therefore, not entitled to qualified immunity based on the exercise of the community caretaking function.

>    *c.  Whether Defendants Pacheco and Gallegos are Entitled to Qualified Immunity Regardless of Whether Defendant Lopez is entitled to Qualified Immunity*

Finally, Defendants argue for the first time in their reply that Defendants Pacheco and Gallegos are, nevertheless, entitled to qualified immunity because they were not involved in the decision to arrest Plaintiff.  The Court need not consider such a late argument which Plaintiff has not had an opportunity to respond to.  *See, e.g., Pedroza v. Lomas Auto Mall, Inc.*, 2013 WL 4446770, at *20 (D.N.M.).  Moreover, although Defendants recognize that the collective knowledge doctrine allows an officer to arrest an individual based on information attained by another officer, Defendants do not supply any legal support for their newly raised argument which attempts to distance Defendants Pacheco and Gallegos from Defendant Lopez's actions. *See* D.N.M. LR-Cv 7.3(a) (a "reply must cite authority in support of the legal positions advanced.").  For the above reasons, the Court declines to address this last argument in favor of qualified immunity for Defendants Pacheco and Gallegos.

>    *d.  Conclusion*

Plaintiff has carried his burden of showing that Defendants violated his Fourth Amendment right to be free from an unreasonable seizure, a right which Defendants do not dispute was clearly established at the time of Plaintiff's arrest.  *See* (Doc. 47) at 8 ("The right to be free from unreasonable searches and seizures has been clearly established since the ratification of the Constitution in 1789.").  Defendants are, therefore, not entitled to qualified immunity and summary judgment on the Fourth Amendment unlawful arrest claim.

    *2.  The Fourth Amendment Excessive Force Claim*

The Court notes that Plaintiff does not address Defendants' arguments supporting qualified immunity on the Fourth Amendment excessive force claim.  Defendants, therefore, ask that the Court find that Plaintiff abandoned his excessive force claim.  The Court, however, cannot enter summary judgment on a claim simply because Plaintiff did not respond to Defendants' arguments.  *See Reed*, 312 F.3d at 1195.  Hence, the Court will address whether Defendants are entitled to qualified immunity on the excessive force claim.

To succeed on a Fourth Amendment excessive force claim based on handcuffing, the plaintiff must demonstrate "an actual, non-de minimis physical, emotion, or dignitary injury…." *Fisher v. City of Las Cruces*, 584 F.3d 888, 899 (10th Cir. 2009).  It is undisputed in this case that Plaintiff did not suffer any actual or even non-de minimis injury whether physical, emotional, or otherwise.  Consequently, Plaintiff has not carried his burden of showing that Defendants violated his Fourth Amendment right to be free from the use of excessive force.  Defendants are, therefore, entitled to qualified immunity and summary judgment on the excessive use of force claim, and that claim will be dismissed with prejudice.

    IT IS ORDERED that

1.   Defendants' Motion for Summary Judgment on Count I of Plaintiffs' Complaint Based on Qualified Immunity and Memorandum of Law in Support (Doc. 27) is granted in part;

2.   summary judgment will be entered in Defendants' favor on the Count I Fourth Amendment use of excessive force claim; and

3.   that claim will be dismissed with prejudice.

_____
UNITED STATES DISTRICT JUDGE